INVENTORY LOCATOR SERVICE,
INC., Plaintiff–Appellant,

v.

Walter DUNN and Community Bank of
Germantown, Defendants–Appellees.

Court of Appeals of Tennessee,
Western Section, at Jackson.

May 10, 1989.

Permission to Appeal Denied by
Supreme Court Aug. 7, 1989.

John J. Heflin, III, Burch, Porter & Johnson, Memphis, for plaintiff-appellant.

Richard L. Winchester, Jr., Winchester Law Firm, Memphis, for defendants-appellees.

HIGHERS, Judge.

On September 22, 1986, Inventory Locator Service, Inc. ("ILS") filed a complaint against Walter Dunn, a former employee, and Community Bank of Germantown ("CBG") in the Chancery Court of Shelby County, Tennessee, after discovering that approximately 125 checks made payable to it had been stolen and deposited by Dunn at CBG. ILS requested an injunction prohibiting the withdrawal of any funds from any accounts opened by Dunn at CBG. The injunction was issued on October 6, 1986, and, as a result, $20,358.52 was frozen in Dunn's account. By subsequent consent order this frozen sum was paid over to ILS, reducing to that extent the damages sought by ILS in its action.

ILS filed an amended complaint on October 24, 1986. ILS sought damages from Dunn and CBG for conversion and for breach of the bank's duty of inquiry owed to the payee of the checks accepted by CBG for deposit into the account opened by Dunn. ILS also sued other parties, including Dunn's wife, seeking to trace the misappropriated funds and have a resulting trust imposed on them.

The Chancery Court severed all claims of ILS against Dunn, his wife, and CBG for conversion of the checks and ordered that all other claims be postponed pending trial of the claims for check conversion. ILS nonsuited its claim against Mrs. Dunn and proceeded to trial against Dunn and CBG.

After a non-jury trial, the court, by order dated April 26, 1988, entered judgment in favor of ILS against Dunn for the total sum of $111,419.13, but found against ILS with respect to its claims against CBG. ILS has appealed from the judgment dismissing its claims against CBG.

Defendant, Walter Dunn, began working in the accounting department of ILS in the spring of 1984. At the time at issue in the case, between March and September of 1986, Dunn's duties at ILS included customer service and operations duties and keeping track of the accounts receivable and the checks that were received. Within the scope of his duties at ILS, Dunn had no authority to endorse and deposit a check made payable to ILS other than to the account designated on ILS's rubber deposit stamp. He had no authority to open a bank account or handwrite an endorsement for ILS. During this time, Dunn was evaluated highly by his supervisors. In March of 1986, however, Dunn began stealing checks payable to ILS.

Dunn deposited his first stolen check at appellee CBG on March 13, 1986. The check for $93 was drawn on the account of the 3–M Corp. payable to "Inventory Locator Service." Dunn endorsed the check "Inventory Locator Service /s/ Walter Dunn, Jr." The entire endorsement was handwritten. Dunn tendered the check for deposit into his own personal account at CBG. Dunn was known at CBG because he did his personal banking there and had handled the deposits of a former employer there. ILS, however, did not have an account with CBG. No one at CBG questioned the authority of Dunn to endorse and deposit into his personal account a check payable to ILS.

On March 21, 1986, Dunn opened a corporate account at CBG in the name of "ILS Rental, Inc." for the purpose of depositing therein the stolen checks. According to the testimony of Dunn, the new accounts clerk did not ask him to fill out the customary corporate resolution form authorizing the opening of the corporate account. Dunn testified that he was never given such a form at any time. He was given

and filled out a signature card for the account. No copy of a corporate resolution for the "ILS Rental, Inc." account was ever found in CBG's records. Dunn was provided with printed checks and deposit slips for the account; he was the only authorized signatory on the account.

Over a six-month period, Dunn took approximately 175 checks sent and payable to ILS, using his position at ILS to intercept the checks which totalled $117,117.62. He succeeded in covering up these thefts by taking checks for non-billed items, by issuing unauthorized credit memos against billings, and by never taking so much money that ILS's revenues would fail to increase each month.

Using his printed deposit slips, Dunn deposited the stolen checks into the "ILS Rental, Inc." account at CBG. All of the checks, payable to ILS, were endorsed by hand by Dunn before he took them to CBG for deposit. The majority of the endorsements consisted of two lines, the first line being the alleged endorsement of the payee and the second the endorsement of Dunn for "ILS Rental, Inc." The first line typically read "Inventory Locator Serv."; the style of the second line varied. The checks dating from March and April were primarily endorsed "ILS Rental, Inc."; checks from May and afterwards were primarily endorsed simply "ILS, Inc." There was another discernible difference between earlier and later checks. In the earlier checks—generally those dated before May—Dunn apparently made no effort to make the handwriting of the two endorsements look different, e.g., the capital letters are alike in both lines of writing. In the later checks, however, Dunn generally made an effort to write in cursive the first endorsement and to print the second endorsement. Rowe Belcher, senior vice president in charge of operations at CBG, testified that to his knowledge no teller at CBG ever asked Dunn for any identification or what his authority was to be able to deposit the ILS checks and no representative of CBG made any inquiry regarding Dunn's authority to endorse checks made payable to ILS.

Prior to the time of the thefts, Dunn had rather extensive legal problems. He had owned an egg farm which had been destroyed by fire in 1980. This incident was under investigation for arson by state and federal officials. ILS was made aware by Dunn of this investigation before it hired him. Dunn was eventually charged with the federal crime of mail fraud for filing proof of losses with insurance companies for mortgage holders. The jury trial in spring of 1985 resulted in a verdict of guilty which was appealed. The Sixth Circuit reversed and remanded for a new trial based on the admission of improper evidence. Dunn, facing a potential charge on the bail reform act for the ILS thefts committed while he was out on bail, eventually entered into a plea bargain agreement with the federal government whereby he plead guilty to the mail fraud charge without admitting guilt.

Throughout these legal problems, Dunn continued to profess his innocence to his employer, most specifically in a July 8, 1986 memorandum requested by Fred Myers, president of ILS. Although ILS was kept apprised of developments by Dunn, no representative ever attended the trial or reviewed the trial transcript. According to the testimony of Dunn and Myers, no restrictions were put on Dunn's work duties during this period of legal activity; he was free to perform his duties as before.

Dunn's thefts were discovered in September of 1986 when service was cut off to an ILS client for non-payment of services. The client faxed ILS a copy of its cancelled check. Suspicions were raised at ILS because of the handwritten endorsements. An investigation was begun which resulted in the discovery of the thefts. ILS responded to the discovery with the legal actions noted earlier.

In deciding in favor of CBG, the trial court ruled that while its behavior was not perfect, CBG acted in accordance with reasonable banking practices. It also ruled that ILS was negligent in the way it had handled Dunn and his employment duties

in light of his previous criminal conviction. Appellant ILS appeals from these rulings.

The ultimate issue as to both rulings is whether CBG acted in good faith and in a commercially reasonable manner pursuant to T.C.A. §§ 47–3–406 and 47–3–419, in dealing with stolen, forged checks deposited in a phony corporate account opened at its main branch by defendant Walter Dunn. If it did act in such a manner, CBG would not be liable to ILS for conversion of any proceeds beyond those which remained in its hands at the initiation of this action.

We look first to the provisions of T.C.A. § 47–3–419 (1979) which states in part:

(1) An instrument is converted when:

  \*    \*    \*    \*    \*    \*

(c) it is paid on a forged endorsement.

  \*    \*    \*    \*    \*    \*

(3) Subject to the provisions of chapters 1 through 9 of this title concerning restrictive endorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who is not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in its hands.

Because the statute makes commercial reasonableness an affirmative defense, the burden of proof is upon the bank to show that it observed "reasonable commercial standards." *Ickes v. Bache Halsey Stuart Shields, Inc.*, 133 Ariz. 300, 650 P.2d 1282, 1284 (1982). *See also, Clark v. Griffin*, 481 N.E.2d 170, 173 (Ind.App. 1985); *River Parish Services, Inc. v. Goodhope Refineries*, 457 So.2d 1290, 1292 (La. App.1984); *National Bank of Georgia v. Refrigerated Transport Co., Inc.*, 147 Ga. App. 240, 248 S.E.2d 496, 499–500 (1978). Appellant contends that CBG failed to establish facts sufficient to allow the trial court to find commercial reasonableness. We agree.

At trial both sides presented expert testimony with regard to bank policies and procedures. All of the expert witnesses had long experience in the banking industry; the Chancellor was most impressed with the testimony of CBG's expert witness, Larena Tunstall. Rowe Belcher, a senior vice president of CBG, testified that it was the written policy, as contained in CBG's New Accounts Policies and Procedures Handbook, that a completed corporate resolution form and corporate identification number must be obtained from the customer when opening a business checking account such as the one Dunn opened in the name of "ILS Rental, Inc." Belcher testified that CBG's policies and procedures did not require that a corporate resolution and identification number be obtained at the time the account is opened; that if they were not, the customer's Social Security number can be temporarily used instead of the corporate identification number and a copy of the resolution will be kept by CBG in its files as a "tickler" to remind the bank to get the original resolution back. Tunstall, formerly of National Bank of Commerce, gave similar testimony concerning the requirements of a corporate resolution and identification number when opening a business checking account, as did appellant's expert Edward Dunston. Dunston stated, however, that his bank, First American, required that the corporate resolution be completed and returned before a corporate account can be opened.

We find that in the circumstances of this case reasonable commercial practices required that a corporate resolution and identification number be obtained from the customer in order to properly open a corporate checking account, and if not when the account is opened, at least within a reasonable time thereafter. However, CBG offered no proof that it followed even its own policies and procedures in opening the "ILS Rental, Inc." account on March 21, 1986. Dunn testified that when he opened the account he was not asked to obtain a corporate resolution for the account nor given one to fill out and bring back. While the Chancellor was not impressed with Dunn's manner and demeanor on the stand, it is

clear that CBG offered no proof to rebut his testimony.

Belcher testified that CBG never obtained a corporate identification number for "ILS Rental, Inc." from Dunn in the six months the account was opened. And although Belcher had testified that it was CBG's policy to keep a copy of a corporate resolution for the account in its files, none could be found. Marilyn Dewease, the new accounts clerk, who opened Dunn's account, testified that she had no recollection of opening the account although the initialed signature card indicated that she did. Like Belcher, she testified that no corporate resolution for the account could be located in CBG files. Its absence was not explained by CBG nor was its failure to obtain in six months time a corporate identification number for "ILS Rental, Inc."

The Chancellor apparently believed that because Dunn could have forged a corporate resolution and returned it to the bank, CBG's failure to require a copy is irrelevant. This logic misses the point. Whether or not requiring a copy of a corporate resolution would have actually foiled Dunn's scheme, CBG's failure to do so prohibits a finding that CBG acted in a commercially reasonable manner.

CBG, which has the burden of establishing facts which show that it met commercially reasonable standards failed to put on any competent proof that it followed even its own policies and procedures in opening the "ILS Rental, Inc." account. While a bank's own procedures cannot in and of themselves be equated with reasonable commercial standards, *River Parish Services, Inc., supra; Walters v. Alden State Bank*, 155 Mich.App. 29, 399 N.W.2d 432 (1986), a bank's failure to follow its own normal procedures is indicative of a failure to act in accordance with reasonable commercial standards.

■ It also appears that CBG failed to prove that it acted in a commercially reasonable manner in accepting without question the checks payable to ILS for deposit into the "ILS Rental, Inc." account. As noted previously, the checks contained handwritten endorsements stating, generally, "Inventory Locator Serv." then "ILS Rental, Inc." or "ILS, Inc." The Georgia Court of Appeals in *Trust Co. of Georgia Bank of Savannah, N.A. v. Port Terminal & Warehousing Co.*, 153 Ga.App. 735, 740, 266 S.E.2d 254, 258 (1980), evaluating commercial reasonableness under U.C.C. § 3–406, declined to adopt a rule which would make "the mere failure to check the validity of ostensibly valid endorsements on third party checks commercially unreasonable as a matter of law," and so do we here. The true rule of commercial reasonableness is, "whether a reasonable man in accordance with reasonable commercial standards would be put on notice of some impropriety appearing either from the form of the instrument and its endorsement or from knowledge of facts outside the instrument itself." *Id.*

In the instant case, all of the approximately 125 checks deposited in the "ILS Rental, Inc." account over the six month period bore a handwritten endorsement purporting to be that of Inventory Locator Service. Testimony at trial indicated that the checks were all accepted without question by CBG for deposit. The handwritten corporate endorsements were sufficient to place a reasonable bank employee on notice to make some inquiry of the customer tendering such a check for deposit. CBG offered no mitigating proof.

■ As to the checks deposited into Dunn's personal account, endorsed by Dunn as a third party, we note that it is not normal business practice for the corporate payee of checks to endorse them in blank and deliver them to third parties. *See Confederate Welding and Safety Supply, Inc. v. Bank of Mid–South*, 458 So.2d 1370 (La. App.1984); *Sherriff–Goslin Co. v. Cawood*, 91 Mich.App. 204, 283 N.W.2d 691 (1979); *Belmar Trucking Corp. v. American Trust Co.*, 65 Misc.2d 31, 316 N.Y.S.2d 247 (N.Y. County Civ.Ct.1970). It is the usual practice for a corporation to deposit checks payable to it into its own account and then draw checks on this account. *See Sherriff–Goslin Co., supra; Gresham State Bank v. O and K Construction Co.*, 231

**528**

Or. 106, 370 P.2d 726, 372 P.2d 187, 100 A.L.R.2d 654 (1962).

This abnormality is even more glaring in light of evidence that some of the corporate and third party endorsements had been written by the same hand. The endorsements in both cases were irregular, and CBG should have questioned their validity.

 At most, CBG offered proof that it would rely on the familiar face of a customer such as Dunn, who under the U.C.C. warrants the validity of all prior endorsements and against whom the bank would have ready recourse in accepting for deposit a third party check. But the court in *Belmar Trucking Corp.*, 65 Misc.2d at 37, 316 N.Y.S.2d at 253, dealing with a forged corporate endorsement on third party checks, held that the U.C.C. warranties do not absolve a collecting bank from the obligation of inquiry into the validity of a corporate endorsement. The fact that a depositor of a check is a bank customer does not absolve the bank of its duty to inquire about abnormalities. *Tubin v. Rabin*, 389 F.Supp. 787, 790 (N.D.Tex.1974), *aff'd*, 533 F.2d 255 (5th Cir.1976); *National Bank of Ga.*, 248 S.E.2d at 500. While it may be practical, expedient and even customary for a bank to rely on a familiar customer who is the last endorser, and even though the bank may have recourse against a customer upon whose warrants it relies, such reliance is not in all circumstances commercially reasonable. *See Perley v. Glastonbury Bank and Trust Co.*, 170 Conn. 691, 368 A.2d 149, 155, 92 A.L.R.3d 259 (1976).

 With respect to the negligence issue, because we have found CBG did not act in a commercially reasonable manner, CBG may not take advantage of the estoppel in T.C.A. § 47–3–406. *Mohr v. State Bank of Stanley*, 241 Kan. 42, 734 P.2d 1071, 1078 (1987); *Salsman v. National Community Bank of Rutherford*, 102 N.J. Super. 482, 246 A.2d 162, 168 (1968); *Gresham State Bank, supra.*

Having determined that CBG did not, under the circumstances, act in accordance with reasonable commercial standards of the banking business as required by both T.C.A. §§ 47–3–406 and 47–3–419, the question of good faith becomes moot. For the foregoing reasons, the decision of the trial court is reversed, and the matter is remanded for entry of judgment and for such other proceedings as may be necessary in accordance with the opinion of the Court. Costs are adjudged against appellee.

TOMLIN, P.J., W.S., and FARMER, J., concur.