**FEDERAL INSURANCE COMPANY,**
**Plaintiff–Appellant, Cross–**
**Appellee,**

v.

**NCNB NATIONAL BANK OF NORTH**
**CAROLINA, Defendant–Appellee,**
**Cross–Appellant,**

**NCNB National Bank of Florida,**
**Defendant–Appellant.**

No. 90–5975.

United States Court of Appeals,
Eleventh Circuit.

April 24, 1992.

Robert G. Post, Miami, Fla., for Federal Ins. Co.

Frank J. Sinagra, Ronald G. Englert, Ft. Lauderdale, Fla., for NCNB Nat. Bank of North Carolina.

Before COX, Circuit Judge, DYER and FRIEDMAN *, Senior Circuit Judges.

FRIEDMAN, Senior Circuit Judge:

This diversity damage suit grew out of a scheme by which a corporate employee em-

* Honorable Daniel M. Friedman, Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation.

bezzled substantial amounts from her employer by obtaining payment of corporate checks that had not been properly signed, and converting the proceeds. After the embezzlement was discovered, and the banks denied liability for the payments, the employer's insurance company paid the losses. The insurance company as the subrogee and assignee of the employer then brought this suit against the banks. The district court held that the banks were negligent in paying the checks, but that because the employer also was negligent, it was responsible for 50 percent of its losses. Both the insurance company and the banks have appealed. We uphold the district court's determination that the banks are liable, but reverse the 50 percent reduction in the damages.

## I.

A. In late 1985 and early 1986, Computer Products, Inc. (Computer), a Florida corporation, opened two accounts with NCNB National Bank of North Carolina (NC Bank), for one of its operating units. Computer's corporate resolutions authorizing these accounts, submitted on forms that NC Bank furnished, provided that checks for up to $500.00 required one signature by hand or facsimile, that checks between $500.00 and $10,000.00 required one hand and one facsimile signature, and that checks of more than $10,000.00 required "two signatures by hand." The resolutions stated that they "shall remain in full force and effect until written notice of their amendment or rescission shall have been received by [NC Bank]."

Computer also submitted to the bank a signature card for each account listing the persons (and showing their signatures) authorized to sign checks on the account. Elizabeth Johnson, the comptroller of the unit for which these accounts were opened, had substantial responsibility with respect to the preparation, approval, and issuance of checks drawn on several Computer accounts, and supervised these two. She was one of the Computer personnel authorized to sign checks on the two accounts.

The first forty-six checks for more than $10,000.00 drawn on these accounts contained the required two handwritten signatures. In early 1986, a check for more than $60,000.00 for a legitimate corporate expenditure, but containing one hand and one facsimile signature, was presented to NC Bank for payment. A clerk at the bank, Kimberly Clayton, telephoned Computer about the check. She spoke to Elizabeth Johnson, who instructed her to pay the check and told her to expect to pay, in the future, many more checks exceeding $10,000.00 that would have one hand and one facsimile signature.

Clayton testified that she based her decision to pay that check, and all subsequent checks, solely on what Johnson told her on the telephone that day. The record shows no other contact between Computer and NC Bank regarding authorization to pay checks lacking the required signatures. NC Bank subsequently paid numerous checks for more than $10,000.00 drawn on the two accounts, even though they had one hand and one facsimile signature.

At about the same time, Elizabeth Johnson began to implement a plan to embezzle funds from her employer. Before the scheme was discovered, Johnson submitted nine checks, each for more than $10,000.00, the proceeds of which she converted. During the intervening three weeks she also drew a number of checks for valid corporate purposes. All the checks had one hand and one facsimile signature. NC Bank paid the checks as they were presented, apparently in reliance on the prior telephone conversation between Johnson and Clayton.

Five of the checks for more than $10,000.00 with only one handwritten signature were payable to "NCNB." Those checks were presented to NCNB National Bank of Florida (Fla. Bank), which exchanged them for its own cashiers checks payable to various individuals, including two payable to Elizabeth Johnson's husband (whose last name was not Johnson).

By the time Computer received its bank statements from NC Bank listing the fraudulent checks, all but one of them had

already been paid. The remaining invalid check was paid a few days after Computer received the statements.

B. When the embezzlement was discovered, NC Bank refused to restore to Computer's account the amount it had paid on the fraudulent checks. The appellant Federal Insurance Company (Federal), a New Jersey company which insured Computer against such losses, paid Computer for the losses.

Federal then filed the present suit in the United States District Court for the Southern District of Florida against NC Bank and Fla. Bank. Suing as the assignee and subrogee of Computer, Federal sought damages for the amounts it had paid Computer to cover Computer's losses on seven of the fraudulent checks. Federal asserted that NC Bank had breached its contract with its depositor Computer and negligently had paid the checks that had only one hand signature, and that Fla. Bank negligently had exchanged the checks with only one hand signature for its own cashier's checks without properly inquiring into the propriety of the exchange.

After a bench trial, the district court held that the banks had been negligent in paying and exchanging the checks. The court found that NC Bank "disregarded the provisions of the corporate resolution and signature card requiring two handwritten signatures on all checks in excess of $10,000," and that Fla. Bank "failed to properly inquire where the proceeds of five corporate checks payable to NCNB should be distributed and breached its duty of inquiry." The court further found that Computer "was negligent in failing to employ reasonable auditing procedures and in failing to check procedures for disbursements, including signature requirements" and "also ignored its own corporate resolution and signature requirements." The court found that the banks and Computer "are equally guilty of the same amount of negligence," and that Computer and "the issuing bank are equally responsible for the embezzlement by Elizabeth Johnson."

In its conclusions of law, the court stated that "[a]ll of Plaintiff's claims should fall except for negligence," and that "[o]n the issue of negligence, Plaintiff and Defendants bear equal responsibility and Defendants should pay 50% of all damages incurred."

## II.

In a joint pretrial stipulation, Federal and the banks agreed that the "dispute is governed by Florida law." We think that the "Florida law" to which the parties referred was solely Florida substantive law, and did not include Florida choice of law rules. Indeed, since this is a diversity case, the stipulation would be unnecessary if it included the latter rules. *See Klaxon Co. v. Stentor Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941).

Though we are not bound by it, *Tomlinson v. Orange County, Fla.*, 785 F.2d 933, 935 n. 2 (11th Cir.1986), we see no reason to disregard the stipulation. Florida had significant contacts with the transaction. Although NC Bank is a national bank whose principal place of business is in North Carolina, Computer is a Florida corporation with its principal place of business in Florida. The accounts were opened in Florida and the checks containing only one hand signature presumably were executed there. In the circumstances, "this is a 'reasonable stipulation[ ] of choice of law,' and it will be honored." *Marmon Group, Inc. v. Rexnord, Inc.*, 822 F.2d 31, 34, n. 2 (7th Cir. 1987) (quoting *Lloyd v. Loeffler*, 694 F.2d 489, 495 (7th Cir.1982)). *See also Montana Power Co. v. Public Utility District No. 2*, 587 F.2d 1019, 1021–1022 n. 1 (9th Cir. 1978). Accordingly, we shall apply Florida substantive law to resolve the legal issues in this case.

## III.

A. The district court correctly held that NC Bank was negligent in paying the fraudulent checks for more than $10,000.00 that had one hand and one facsimile signature. The bank's duty not to pay those checks was created and defined by the contractual arrangements that the bank and

Computer entered into when the accounts were opened.

■ The resolution of Computer's board of directors designated the NC Bank for the opening of an account, imposed the two-hand-signature requirement for checks of more than $10,000.00, and authorized the bank "to pay all instruments signed in accordance with the foregoing resolution." The clear implication was that the bank was not authorized to pay any check not signed in accordance with the resolution. "[T]he relationship between a bank and its depositing customer is contractual." *MJZ Corp. v. Gulfstream First Bank & Trust,* 420 So.2d 396, 397 (Fla.Dist.Ct.App.1981) (citing *McCrory Stores Corp. v. Tunnicliffe,* 104 Fla. 683, 140 So. 806 (1932)). Section 401 of the Uniform Commercial Code (UCC) (Fla.Stat. § 674.401(1)) similarly contemplates that a bank will pay only in accordance with its contractual obligations to its customers. It provides: "As against its customer, a bank may charge against his account any item which is otherwise properly payable...." A check bearing an unauthorized signature is not properly payable. *See Medford Irrigation Dist. v. Western Bank,* 66 Or.App. 589, 676 P.2d 329, 333 (1984).

When NC Bank paid the seven fraudulent checks involved in this case that had only one hand signature, it acted negligently because it violated the contractual undertaking upon which the account had been opened that checks for more than $10,-000.00 would not be paid unless they had two hand signatures. The corporate resolutions authorizing the accounts provided the resolutions would remain effective until the bank received "written notice" of their amendment or rescission. The bank had not received such written notice prior to paying the seven checks.

■ The oral notice the bank received from Elizabeth Johnson that it should pay the first such check and others similarly signed that it would receive did not justify the bank in departing from the terms upon which the bank opened the account and agreed to handle it. NC Bank's payment of the seven checks for more than $10,-000.00 that had only one hand signature was negligent because it breached the bank's duty to Computer, based upon the corporate resolutions pursuant to which Computer had opened and the bank had accepted the accounts, not to pay checks that were not signed as the resolutions directed.

NC Bank argues, however, that it was authorized to pay the checks because (1) Johnson had actual authority to waive the two-hand-signature requirement by virtue of being one of the Computer officials authorized to sign checks or (2) had apparent authority to do so, or (3) Computer ratified the payment of the checks, or (4) there was a course of dealing between Computer and NC Bank that authorized the bank to deviate from the two-hand-signature requirement.

■ There is no indication that Johnson had any authority, either actual or apparent, to permit the bank to deviate from the two-hand-signature condition in the corporate resolutions. The resolution stated that they would remain effective until the bank received written notice of their amendment or rescission. As the district court found, "[b]etween the date NCNB North Carolina received the CPI corporate resolution for the RTP division account and the time it was advised of the embezzlement by Elizabeth Johnson there were no written agreements entered into between NCNB North Carolina and CPI altering, revising, or modifying the [two handwritten signature requirement]." The fact that Elizabeth Johnson was authorized to sign checks did not clothe her with authority to permit deviation from the conditions upon which the board of directors authorized the accounts to be operated.

■ Nor is their anything in the record to show that Computer ratified the payment of the fraudulent checks with only one paid signature or engaged in a course of dealing with NC Bank that permitted the bank to deviate from its contractual obligations. The first forty-six checks for more than $10,000.00 conformed to the corporate resolutions. Immediately upon

learning of the bank's payment of non-conforming checks, Computer sought to stop it. Immediately upon learning of the fraudulent checks, Computer and NC Bank cooperated in investigating the matter. When Computer discovered that there were several outstanding checks for more than $10,000.00 with only one hand signature that were for legitimate purposes, it instructed NC Bank to pay them. This practical step to avoid unnecessary work and problems does not even suggest any ratification by Computer of the NC Bank's payment of the fraudulent checks or constitute a course of dealing between Computer and NC Bank authorizing such payment.

■ The fact, upon which NC Bank relies, that Computer may have issued a series of checks for more than $10,000.00 with one hand and one facsimile signature drawn on its account with another bank, cannot establish the propriety of NC Bank's payment of such checks. The relationship between a depositor and a particular bank controls only the dealings between those two entities, and cannot implicitly authorize the same relationship between the depositor and another bank.

■ B. We also agree with the district court that Fla. Bank was negligent in issuing its cashier's checks in exchange for checks for more than $10,000.00 containing only one hand signature and payable to NCNB, without inquiring about the propriety of such exchange.

■ A bank that receives a check payable to it, where the drawer is not indebted to it, has a duty, before paying the check, to inquire whether the drawer's agent is authorized to negotiate the check, since the bank is authorized to pay the check only in accordance with the drawer's directions. *See, e.g., Kaiser–Georgetown Comm. Health Plan, Inc. v. Bankers Trust Co. of Albany,* 110 Misc.2d 320, 442 N.Y.S.2d 48 (N.Y.Sup.Ct.1981). In the present case, the checks that Fla. Bank exchanged for cashier's checks were payable to "NCNB." Fla. Bank has some affiliation with NC Bank: its name is "NCNB National Bank of Florida"; NC Bank designated an employee of Fla. Bank as account officer for

all accounts that Computer maintained with NC Bank; and NC bank conducted its dealings with Computer through Fla. Bank. This connection with NC Bank probably was sufficient to invoke the foregoing rule. If not, then Fla. Bank's duty of inquiry before exchanging checks payable to another bank was even stronger.

Contrary to its contention, Fla. Bank cannot justifiably claim that it relied upon the apparent authority of the Computer employee who exchanged the checks to take that action. Fla. Bank states that the employee, a Computer bookkeeper, was well known to Fla. Bank, had conducted banking business with it for Computer for a couple of years, and previously had exchanged Computer checks for Fla. Bank cashier's checks. The Fla. Bank employee who exchanged the checks testified (1) that she believed the person who made the exchange was a "runner" for Computer, but did not know that person's position; (2) that she made no inquiry whether the person exchanging the checks had authority to do so; (3) that when she was requested to exchange Computer checks payable to NCNB for cashier's checks payable to other parties, she did not attempt to confirm that request with someone at Computer; and (4) that the only information she had concerning the authority of the person exchanging the checks was what that person told her. This was insufficient to establish that the Computer bookkeeper who exchanged the checks in these unusual transactions had apparent authority to do so. *See Smith v. American Auto. Ins. Co.,* 498 So.2d 448, 449 (Fla.Dist.Ct.App.1986).

Fla. Bank next contends that the agreement under which Computer opened and maintained its accounts with NC Bank negated any duty by Fla. Bank to inquire before exchanging the checks. It relies upon the following provision in the corporate resolutions:

FURTHER RESOLVED, that NCNB NATIONAL BANK OF NORTH CAROLINA be and it hereby is authorized to honor, receive, certify, or pay all instruments signed in accordance with the foregoing resolution even though drawn

or endorsed to the order of any officer or employee signing the name or tendered by him for cashing, or in payment of the individual obligation of such officer or employee, or for deposit to his personal account, and said bank shall not be required or be under any obligation to inquire as to the circumstances of the issuance or use of any instrument signed in accordance with the foregoing resolution, or the application or disposition of such instrument or the proceeds thereof.

This provision relieved NC Bank of its duty of inquiry only with respect to checks "signed in accordance with the foregoing resolution." The checks that Fla. Bank exchanged were not signed in accordance with the resolution, since, although for more than $10,000.00, they had only one hand signature. Moreover, this provision relieved only NC bank, not Fla. Bank, of a duty to inquire. Indeed, it is difficult to understand how Fla. Bank can rely upon a provision in an agreement between Computer and a different bank.

■ Finally, Fla. Bank contends that even if it may have had a common law duty of inquiry, that duty was terminated when Fla. adopted the UCC. It relies upon Fla. Stat. § 673.405, which makes certain check endorsements effective and relieves from liability a bank that negotiates an instrument with a forged or unauthorized endorsement.

Fla. Bank has pointed to nothing, however, that even suggests, let alone shows, that in adopting this provision of the UCC Florida intended to terminate a bank's established common law duty to make inquiry before paying checks to it from a party not indebted to it. Although we have found no Florida case deciding the question, other courts have indicated that the adoption of the UCC did not abolish a bank's common law duty of inquiry. *See, e.g., Bullitt County Bank v. Publishers Printing Co.,* 684 S.W.2d 289, 292 (Ky.Ct.App.1984); *Kaiser–Georgetown Comm. Health Plan, Inc. v. Bankers Trust Co. of Albany,* 110 Misc.2d 320, 442 N.Y.S.2d 48 (1981); *Bank of Southern Maryland v. Robertson's Crab House, Inc.,* 39 Md.App. 707, 389

A.2d 388, 393 (1978); *Transamerica Ins. Co. v. United States Nat'l Bank,* 276 Or. 945, 558 P.2d 328, 333 (1976). There is no reason to believe that the Florida courts would conclude any differently.

## IV.

Federal contends that the district court erred in reducing its award against NC Bank by fifty percent based on Computer's own negligence. It does not challenge the fifty percent reduction in the award against Fla. Bank.

The precise rationale of the district court ruling is unclear. All the court stated is that Computer "and the issuing bank are equally responsible for the embezzlement by Elizabeth Johnson" and that Computer and the banks "bear equal responsibility and Defendants should pay 50% of all damages incurred." In supporting the district court's ruling, NC Bank argues that since the district court rejected all but the negligence claims of Computer, the court properly applied Florida law, which provides for allocation of damages in a negligence case, based upon comparative negligence. Presumably, this was the basis of the district court's awarding Federal only fifty percent of the $171,295.00 damages the court found Computer had incurred from NC Bank's "improper payment of" the seven checks.

■ Federal counters that the provisions of the UCC that Florida has adopted determine a bank's liability to its depositor for improper payment of the depositor's checks, and that under those provisions, if the bank acted negligently, the depositor's own negligence is irrelevant and cannot reduce the amount of the depositor's damages.

We agree with Federal.

Florida statute § 674.406, which provides a defense to a bank if a customer fails to discover and report unauthorized signatures within 14 days of receipt of the first bank statement containing such an instrument, further provides that this defense "does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the item(s)." Fla.Stat.

§ 674.406(3). Similarly, Section 673.406, which gives the bank a defense against any customer whose negligence substantially contributes to an unauthorized signature, provides that this defense is unavailable if a bank fails to act in accordance with "reasonable commercial standards."

■ Since NC Bank acted negligently in paying the seven checks that had only one hand signature, necessarily the bank acted with "lack of ordinary care ... in paying the item[s]" and failed to act in accordance with "reasonable commercial standards."

Although the Florida courts apparently have not decided the question, other state courts have interpreted these provisions of the UCC as making the bank wholly and strictly liable when both it and the customer have been negligent. *See, e.g., Putnam Rolling Ladder Co. v. Manufacturers Hanover Trust Co.*, 74 N.Y.2d 340, 546 N.E.2d 904, 906–07, 547 N.Y.S.2d 611, 613–14 (1989); *Waukon Auto Supply v. Farmers and Merchants Sav. Bank*, 440 N.W.2d 844 (Iowa 1989); *Inventory Locator Serv. v. Dunn*, 776 S.W.2d 523 (Tenn.App.1989); *McDowell v. Dallas Teachers Credit Union*, 772 S.W.2d 183 (Tex.Ct.App.1988); *American Sec. Bank v. American Motorists Ins. Corp.*, 538 A.2d 736 (D.C.App. 1988). *See also Medford Irrigation District*, 676 P.2d at 333:

> If it is determined that the bank is negligent, the defense of the customer's negligence is not available, and the bank is strictly liable for improperly debiting the customer's account;

*Bank of Southern Maryland v. Robertson's Crab House*, 39 Md.App. 707, 389 A.2d 388, 397 (1978), ("[T]he Bank was negligent as a matter of law in paying [the] checks, and thus it cannot claim the benefit of §§ 3–406 or 4–406(2).... '[I]f the bank failed to use ordinary care it always loses, whether the customer was negligent or not.'") (quoting Whaley, *Negligence and Negotiable Instruments*, 53 N.C.L.Rev. 1, 14 (1974)); *Behring Int'l, Inc. v. Greater Houston Bank*, 662 S.W.2d 642 (Tex.Ct. App.1983) (comparative negligence inapplicable to suit for breach of contract and conversion under UCC; rights of parties are determined by statutory rules rather than by common law negligence); Accord, *Hanover Ins. Co. v. Brotherhood State Bank*, 482 F.Supp. 501, 505 (D.Kan.1979). *See also* the following statement by the New York Court of Appeals in *Putnam Rolling Ladder*, 546 N.E.2d at 908, 547 N.Y.S.2d at 615, in which the court awarded the plaintiff its full damages where the trial court found that the customer and the bank each had been 50 percent negligent and had apportioned the damages accordingly:

> The importation of comparative negligence into the UCC—which was drafted before widespread acceptance of comparative fault—is not without its advocates (noted in, 1 White & Summers, op. cit., Sec. 16–7, n. 6, at 809), but has generally been rejected by both courts and commentators (id). We agree. As one court stated in addressing this issue, "the balancing of rights under the UCC represents the ultimate distillation of a painstaking process of evolution, pursuant to which the risk of loss in commercial matters has been attempted to be adjusted in a fair and equitable manner." (*Five Towns Coll. v. Citibank*, 108 A.D.2d 420, 429–30[, 489 N.Y.S.2d 338]; *see also, United States Fid. & Guar. Co. v. Federal Reserve Bank*, 620 F.Supp. 361 [ (D.C.N.Y.1985) ].) It is not for the courts to unsettle the UCC's carefully drawn balance by introducing comparative fault principles taken from tort law.
>
> Moreover, the UCC serves an important objective not shared by the law of torts (see, by analogy, *Board of Educ. v. Sargent, Webster, Crenshaw & Folley*, 71 N.Y.2d 21, 29, [523 N.Y.S.2d 475, 517 N.E.2d 1360] ). Unlike tort law, the UCC has the objective of promoting certainty and predictability in commercial transactions. By prospectively establishing rules of liability that are generally based not on actual fault but on allocating responsibility to the party best able to prevent the loss by the exercise of care, the UCC not only guides commercial behavior but also increases certainty in the marketplace and efficiency in dispute

resolution. These ends would not be furthered by the introduction of the sort of fact inquiries necessitated by comparative negligence.

Once again, there is no reason to believe that the Florida courts would disagree with this well established line of authority. As the commentary to Fla.Stat. § 674.406 states:

Subsection (3). Under the shifting burden of proof provided in this subsection, even though the bank shows negligence on the part of the customer, it cannot escape liability if the customer succeeds in establishing that the bank was also negligent. In other words, where both are negligent, the bank bears the loss—a neat twist to the contributory negligence rule.

Although many of the foregoing cases involved unsuccessful attempts by a negligent bank to avoid any liability to a depositor because of the latter's contributory negligence, the principle those cases established is equally applicable to NC Bank's attempt to limit its liability by applying state comparative negligence principles. Indeed, those principles are inapplicable under the UCC.

We therefore conclude that under Florida law no reduction in the damages Computer suffered as a result of NC Bank's negligent payment of the seven checks would be appropriate to reflect Computer's own negligence.

## V.

The judgment of the district court is affirmed with respect to the damage award against Florida Bank. It is vacated with respect to the damage award against NC Bank and the case is remanded to that court for entry of a judgment for Federal against NC Bank for the full amount of the damages Computer suffered as a result of NC Bank's negligent payment of the seven checks.