[ PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 25 2000
THOMAS K. KAHN
CLERK

No. 99-11396

D.C. Docket No. 96-02969-CIV-ASG

ARKWRIGHT MUTUAL INSURANCE CO.,

Plaintiff-Appellant,

versus

NATIONSBANK, N.A., (SOUTH),
f.k.a. NationsBank of Florida, N.A.,
NATIONSBANK, N.A. (SOUTH),

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Florida

**(May 25, 2000)**

Before COX, Circuit Judge, GODBOLD and MESKILL*, Senior Circuit Judges.

_____
*Honorable Thomas J. Meskill, Senior U.S. Circuit Judge for the Second Circuit, sitting by
designation.

PER CURIAM:

This case arose from the forgery of 27 checks drawn on a Florida Power and Light PMIS disbursement bank account at NationsBank. Between June and October of 1993 forgers created 27 fake checks totaling $4,387,057.05 and paid by banks across the United States. Arkwright Mutual Insurance Company is a commercial crime insurer that reimbursed Florida Power and Light (FPL) for the forged check losses. After FPL notified NationsBank of the forged checks, NationsBank unsuccessfully attempted to recover the funds from the collecting banks that received payment for the forged checks. Because it did not receive reimbursement from the collecting banks NationsBank refused to credit FPL's account. NationsBank contended that its banking contract with FPL shifted the risk for loss by forgery to FPL because the bank allowed FPL to use a facsimile signature machine. Arkwright filed this diversity suit in an attempt to recover the losses from the forgeries. The district court granted NationsBank's summary judgment motion after finding that the parties contractually agreed to shift the risk of loss to FPL and that NationsBank's exercised ordinary care when it processed the forged checks. We must decide whether this interpretation of the banking contract is correct and whether summary judgment was properly granted. We agree with the district court that the contract shifted the risk of loss to FPL and affirm that portion of the district court's decision. However, the record is not sufficiently developed to determine whether NationsBank acted with ordinary care. Therefore we reverse and remand the case for further proceedings to

determine if NationsBank acted with ordinary care when it processed the forged checks.

Arkwright sued Nationsbank to recover the amount debited from FPL's account for violations of Florida's version of the U.C.C. and for breach of the banking contract.[1] Ordinarily, a drawee bank is absolutely liable to its customer for payment of a forged check. Because a forged check is not a "properly payable item," Fla. Stat. § 673.4031 (1993); see also Perini Corp. v. First Nat'l Bank, 553 F.2d 398, 403 (5th Cir.1977), a forged maker's signature is wholly inoperative as the professed drawer's signature. Perini, 553 F.2d at 403. Any payment on such an instrument is not to the professed drawer's order and violates the drawee bank's strict duty to charge the account of its customer only for properly payable items. Perini, 553 F.2d at 404. Arkwright's U.C.C. cause of action is based on Florida Uniform Commercial Code Statute § 674.401 which provides that a bank may only charge against its customer's account an item that is properly payable from the account. Arkwright's breach of contract action alleges that the account agreement did not permit NationsBank to pay and charge forged checks against the FPL account.

---

[1] Arkwright is equitably surrogated to any claims FPL may have against the person or persons liable for the loss and has obtained an assignment of FPL's claims against the person or persons liable for the loss.

NationsBank contends that it had no duty to reimburse FPL's account because the banking contract incorporated language in an FPL Corporate Resolution that instructed the bank to accept, honor, and pay all checks "bearing or purporting to bear" the facsimile signature of FPL's authorized representative. Florida's version of the U.C.C. allows a bank and its customer to contract around the default rules set forth in U.C.C. Fla. Stat. § 674.103(1);[2] 19B Fla. Stat. Ann., U.C.C. Comment to § 674.103 (1993) (indicating that § 674.103(1) "permits within wide limits variation of the effects of provisions of the article by Agreement."). Under Fla. Stat. § 674.401(1), a check that would not otherwise be properly payable becomes properly payable if it is authorized by the customer and is in accordance with the banking agreement. This statute is consistent with Florida common law which recognizes that the relationship between a bank and its customer is contractual in nature. See Federal Ins. Co. v. NCNB Nat. Bank of N.C., 958 F.2d 1544, 1548 (11th Cir. 1992). However, Arkwright contends that the checks at issue were not properly payable because no

---

[2]     The effect of the provisions of this chapter may be varied by agreement, but the parties to the agreement cannot disclaim a bank's responsibility for lack of good faith or failure to exercise ordinary care or limit the measure of damages for the lack of failure. However, the parties may determine by agreement the standards by which the bank's responsibility is to be measured if those standards are not manifestly unreasonable.

Fla. Stat. § 674.103(1).

4

clause in its banking contract authorized NationsBank to pay checks with forged facsimile signatures.

The parties agreed that NationsBank would move for summary judgment to determine whether the bank had a duty to reimburse FPL under the banking contract. NationsBank filed its motion for summary judgment and included several affidavits attesting that NationsBank acted with ordinary care. FPL objected to the inclusion of any facts contained in NationsBank's summary judgment motion relating to the ordinary care issue because discovery had not yet been conducted. After the district court asked the parties to clarify the facts necessary to resolve NationsBank's summary judgment motion, the parties submitted a joint stipulation setting forth the relevant facts and clarifying the issue before the court. The issue before the district court, as clarified by the stipulation, stated:

<u>The Issue on Summary Judgment</u>
NationsBank's Motion for Summary Judgment raises a specific, narrow issue: whether the FPL/NationsBank banking contract shifts the risk of loss due to forgery from NationsBank to FPL.

The parties stipulated that 1) NationsBank paid forged checks drawn against FPL's account, 2) the checks bore a forgery of FPL's authorized facsimile signature, although the checks appeared to be authentic,[3] and 3) NationsBank paid the forged

---

[3] Each check bore a different serial number corresponding to actual FPL checks that FPL had internally voided or canceled through its check production process without notice to Nationsbank.

checks under the U.C.C. definition of "good faith."[4] The parties did not stipulate, nor do they agree, that NationsBank exercised ordinary care when it paid the checks, and both parties reserved the right to conduct further discovery pending the district court's interpretation of the banking contract.

The banking contract between FPL and NationsBank consisted of 1) a Corporate Resolution of FPL dated July 16, 1992; 2) a Corporate Resolution of FPL dated September 9, 1993; 3) an unsigned and undated Deposit Agreement; 4) the FPL signature cards; 5) Master Agreement for Treasury Management Accounts and Services dated June 18, 1993; 6) the Controlled Disbursement Service Agreement dated June 18, 1993, with Addendum dated July 21, 1993; and 7) an Account Reconciliation Service Agreement dated June 18, 1993.

Arkwright contends that two sections of the contract indicate that there was no agreement shifting the risk of loss to FPL. First, a handwritten provision was included in the Account Reconciliation Service Agreement:

> Except as specifically amended by this Agreement, nothing herein shall alter or affect Bank's liabilities with respect to items improperly paid from Customer's Account, under the Uniform Commercial Code applicable to such items.

---

[4] This means that NationsBank acted honestly and not corruptly or in concert with the forgers.

Second, § 8 of the Deposit Agreement states that NationsBank remains liable for "any amount improperly paid out of the account due to an unauthorized signature."

NationsBank contends that other provisions in the contract expressly modify the bank's liabilities. First, § 8 is qualified by two other sections in the Deposit Agreement. Section 5(b) sets forth FPL's responsibilities regarding the use of facsimile signatures:

> **Facsimile Signatures**: If your items are signed using any facsimile signature or non-manual form of signature, you acknowledge that it is solely for your benefit and convenience. You accept sole responsibility for maintaining security over any device affixing the signature. ***Such signature will be effective as your signature regardless of whether the person affixing it was authorized to do so.***

§ 5(b). (emphasis added). Second, § 1(c) of the Deposit Agreement allows NationsBank to "recognize" resolutions adopted by FPL affecting the account. On July 16, 1992 an FPL Corporate Resolution gave NationsBank authority to pay all facsimile authorized checks up to $500,000 on the PMIS account.

> Resolved, [NationsBank] is hereby authorized and requested to accept, honor and pay, without further inquiry and until written notice of revocation of the authority, hereinafter provided for is received by it, all checks, drafts or other orders for the payment or withdrawal of the monies of the Company as follows:
> . . .
> b.      With respect to the PMIS Disbursement Account,
>     i.      For payments of $500,000 or less, **when bearing or purporting to bear** the facsimile signature of the Treasurer, Controller or an Assistant Treasurer.

§ (b)(i)(emphasis added). A subsequent corporate resolution dated September 9, 1993 amended subsection (b)(i) of the July 16, 1992 Corporate Resolution. The September 9 Corporate Resolution authorized NationsBank to accept, honor, and pay all checks drawn on the PMIS Disbursement Account:

> (b)(i) 1) **when bearing or purporting to bear** the facsimile or actual signature of its Treasurer, Controller, or an Assistant Treasurer; or 2) when bearing the actual signature of its President, any Vice President (excluding the Vice President of Accounting), its Secretary or an Assistant Secretary, or any other person or persons designated from time to time in writing to a bank or trust company by the Chairman of the Board or the President . . .

§ (b)(i) (1-2) (emphasis added). Twenty-four of the twenty-seven checks were drawn on the PMIS Disbursement Account before the September 9, 1993 FPL Corporate Resolution. Two were drawn after this date and the date of one check is uncertain.

## CONTRACTUAL INTERPRETATION

We review the district court's interpretation of a contract de novo. Because the parties stipulated that the signatures on the checks were forgeries the outcome of this issue depends on our interpretation of the phrase "when bearing or purporting to bear." Arkwright contends that this phrase is not a risk shifting clause and served only to allow the bank to pay checks with facsimile signatures that have some technical defect in the ink such as a smudge or a smear. We disagree.

The plain meaning of the phrase includes a much broader class of checks. Blacks Law Dictionary defines "purport" as "The idea or meaning that is conveyed or expressed, especially by a formal document; to profess or claim falsely; to seem to be." Blacks Law Dictionary 1250 (7th ed. 1999). A forgery by its very definition "purports to bear." Because the parties stipulated that the signatures on the checks were exact duplicates of the facsimile signatures, the signature on these checks "seem to be" the authentic signature of the authorized FPL representative. Therefore the checks would be properly payable under the contract because they purport to bear an authorized signature. Arkwright's contention that the September 9, 1993 Corporate Resolution removed this authority is incorrect because it also contains the phrase "bearing or purporting to bear."

The Fifth Circuit reached the same conclusion on similar facts in Perini Corp. v. First Nat'l Bank of Habersham County, 553 F.2d 398 (5th Cir. 1977). Perini is binding on us. See Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981). In Perini the bank and Perini entered into a banking contract that allowed the bank to incorporate corporate resolutions into the contract. Perini passed a corporate resolution that authorized the bank

> to honor all checks, drafts, and other orders of payment of money drawn in the name of Perini Corporation on its Regular Accounts . . . when bearing or purporting to bear the single facsimile signature of R.A. Munroe . . . said banks shall be entitled to honor and charge Perini Corporation for all such checks, . . . regardless of by whom or by what

9

> means the actual or purported facsimile signature thereon may have been affixed thereto, if such facsimile signature resembles the facsimile specimen from time to time filed with said banks.

Perini, 553 F.2d at 400. At a later date someone stole a number of pre-printed checks and gained access to the signature machine or developed a perfect copy of the facsimile signature it produced. Perini sought to be reimbursed after the bank paid on the forged checks. Id. at 401. However, the Fifth Circuit stated that through the language in this corporate resolution Perini contractually assumed the risk of loss for the convenient use of the facsimile signature machine. Id. at 400. The first sentence of the holding reiterated Perini's assumption of the risk: "One answer is clear, however. Perini has no recourse on the unauthorized signature of R. A. Munroe against Morgan or Brown Brothers. Perini's resolution authorizing the drawees' payment of checks bearing signatures resembling the machine-embossed facsimile signature precludes that course of action." Id. at 403. See also Jefferson Parish School Bd. v. First Commerce Corp., 669 So. 2d 1298 (La. Ct. App. 1996) (same holding with similar facts, citing to Perini). Therefore Perini forfeited any claim he had against the bank for good faith payments on forged instruments. Id.

We do not find Perini distinguishable. Although the corporate resolution in Perini did contain additional language in the clause with the phrase "bearing or purporting to bear," the additional language is not necessary to ascertain the plain meaning of the phrase "purporting to bear." This is especially true in the present case

10

because the parties stipulated that the facsimile signatures are identical copies. The plain meaning of the phrase "bearing or purporting to bear" necessarily includes all signatures that are identical to the one produced by the facsimile signature machine.

Arkwright contends that even if the contract shifted the risk of loss for forgery to FPL, such a provision is void under Florida law because it is an exculpatory clause. An exculpatory clause denies an injured party the right to recover damages from the person who negligently caused his injury. See O'Connell v. Walt Disney World Co., 413 So. 2d 444, 446 (Fla. 5th DCA 1982). Arkwright relies on Cumis Ins. Society, Inc. v. Girard Bank, 522 F. Supp. 414 (E.D. Pa. 1981), in support of its contention. Cumis also involved a customer who signed a corporate resolution authorizing the bank to honor checks "bearing or purporting to bear" the facsimile signature of a signature or signatures resembling the facsimile specimens. Id. at 416. The customer sought reimbursement from the bank after the bank paid several checks with a forged facsimile signature. The trial court found that the resolution was insufficient to relieve the bank from liability under Pennsylvania law because the resolution was an exculpatory clause that must be strictly construed against the bank. Id. at 421. Although Cumis directly supports Arkwright's contention, it is not controlling and is distinguishable from the present case.

11

Cumis is distinguishable because exculpatory agreements must be strictly construed against a bank under Pennsylvania law. Florida's public policy against exculpatory clauses indicates that, although viewed with disfavor, they will be enforced if they are clear and unambiguous.  See  Theis v. J & J Racing Promotions, 571 So.2d 92, 94 (Fla. 2d DCA 1990), rev. denied, 581 So.2d 168 (Fla.1991).  Cumis is also inconsistent with the Perini decision that enforced a resolution with similar language under Georgia law. See, e.g., Perini, 553 F.2d 398. See also Jefferson Parish School Bd., 669 So. 2d 1298 (finding bank not liable because resolution contained language authorizing bank to pay checks "bearing or purporting to bear the facsimile signatures"); Wilmington Trust Co. v. Phoenix Steel Corp., 273 A.2d 266 (Del. 1971) (same); Phoenix Die Casting Co. v. Manufacturers and Traders Trust Co., 289 N.Y.S. 2d 254 (N.Y. App. Div. 1968) (same).

Moreover, this was not a true exculpatory clause because NationsBank and FPL did not contract to avoid the bank's duty to exercise ordinary care. Florida Stat. § 674.103(1) allows a customer who wishes to use a facsimile signature machine for his own commercial purposes to enter into an agreement with a bank that shifts the risk of forgery from the bank to the customer as long as the risk shifting agreement does not attempt to disclaim the bank's statutory duties of good faith and ordinary care.[5]

---

[5]  The comment to Fla. Stat. § 674.103(1) states:
Section 1-102 states the general principles and rules for variation of the

NationsBank does not contend nor was there any finding by the district court that the resolution removed the bank's duty of ordinary care. In fact, all parties are in agreement that the bank retained its duty to exercise ordinary care. The district court correctly found that the Corporate resolutions were limited in scope and provided only that Nationsbank was authorized to pay certain checks "bearing or purporting to bear" the facsimile machine signature.

Whether it is wise to enter into an agreement that shifts the risk of loss to the customer does not make such agreements against public policy as long as the agreement does not abrogate the bank's duty to exercise ordinary care. See FDIC v. Carre, 436 So. 2d 227 (Fla. Dist. 2d 1983) (addressing whether a clause limiting the bank's liability toward a customer with a safety deposit box was exculpatory). FPL's

---

effect of this Act by agreement and the limitations to this power. Section 4- 103 states the specific rules for variation of Article 4 by agreement and also certain standards of ordinary care. . . . it would be unwise to freeze present methods of operation by mandatory statutory rules. This section, therefore, permits within wide limits variation of the effect of provisions of the Article by agreement.

Official comment (2) reiterates the parties' ability to vary the UCC:

Subsection (a) confers blanket power to vary all provisions of the Article by agreements of the ordinary kind. The agreements may not disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care and may not limit the measure of damages for the lack or failure, but this subsection like Section 1-102(3) approves the practice of parties determining by agreement the standards by which the responsibility is to be measured. In the absence of a showing that the standards manifestly are unreasonable, the agreement controls.

decision to enter into such an agreement for its own convenience shifted the risk of loss for forged facsimile signatures to FPL but retained the bank's duty to exercise ordinary care and to act in good faith. See Orkin Exterminating Co., Inc. v. Montagano, 359 So.2d 512 (Fla. 4th DCA 1978) (the principles that exculpatory clauses relieving a party of his own negligence are not favored and are unenforceable unless they are clear and unequivocal). The resolution shifting the risk of loss to FPL is enforceable.

ORDINARY CARE

There remains the issue whether NationsBank exercised ordinary care when it processed the forged checks. The district court indicated that summary judgment was proper because it is undisputed that the bank acted in good faith when it paid what appeared to be authentic checks. However, these facts do not answer whether the bank exercised ordinary care when it paid the checks. We conclude that there is insufficient evidence on the record to determine if NationsBank acted with ordinary care.

It is clear from the briefs, the record, and the district court's order that the narrow issue before the district court on summary judgment was whether the banking contract between FPL and NationsBank shifted the risk of loss to FPL. The parties stipulated to a narrow set of facts solely for the purpose of interpreting the bank's general liability under the banking contract. The only evidence on the record addressing whether NationsBank acted with ordinary care consisted of affidavits

14

included with NationsBank's original motion for summary judgment. Arkwright objected to the inclusion of these facts premised on its understanding of the limited scope of NationsBank's motion, and the stipulations make it clear that the parties did not intend to address the ordinary care issue on summary judgment. The stipulations do not support any finding that NationsBank exercised ordinary care, and the record was not sufficiently developed to allow the district court to decide this issue.

The district court's dismissal of the ordinary care issue undermines its own scheduling order in force at the time of this motion. After NationsBank filed for summary judgment, the district court asked Arkwright if discovery was necessary to decide the motion. Arkwright answered "no," conditioned upon the limited scope of the summary judgment motion.[6] However, in both the <u>Stipulation of Arkwright and NationsBank</u> and Arkwright's response to the scheduling motion that the district court issued after NationsBank filed its motion for summary judgment, Arkwright clearly expressed the need for further discovery to determine whether NationsBank used ordinary care when it processed the forged checks.[7]

---

[6] Arkwright and NationsBank limited the issue on summary judgment in the stipulation agreement to whether the FPL/NationsBank banking contract shifts the risk of loss due to forgery from NationsBank to FPL. Arkwright reserved its right to amend its complaint to include breach of ordinary care pending the resolution of the risk shifting issue.

[7] In footnote 3 of the stipulations Arkwright stated:
Arkwright cannot at this time stipulate that NationsBank exercised ordinary care when paying the checks. Ordinary Care is a different

15

We do not find, nor do the parties contend, that the contract relieved NationsBank of its duty to exercise ordinary care.[8] A blanket holding stating that liability shifts to the customer whenever the bank acts in good faith and the checks appear to be authentic abrogates the restriction against contracting away the duty of ordinary care. The district court's analysis ignores the possibility that a bank may breach its duty of ordinary care even when presented with an authentic looking facsimile signature.[9]

---

> concept from good faith under the U.C.C. Ordinary care involves negligence concepts, and is pertinent to statutory defenses. Nationsbank agrees that the issues of contractual risk shifting can be addressed apart from issues of NationsBank's ordinary care.

(internal quotation marks omitted).

[8] On page 7 of NationBank's reply brief in the lower court, it stated: "NationsBank does not suggest an interpretation of the agreement that disavows its duty to exercise ordinary care. In fact, the agreement implicitly, if not explicitly, adopts the duty of ordinary care."

[9] The district court stated:
> The agreement in question is not exculpatory in nature because there is a complete absence of language indicating an intent to either release or indemnify the bank for its own negligence. Limited in scope, the agreement defines the permissible standards of care but does not attempt to disclaim the statutory duty of ordinary care. The resolution does not state that the bank can never be held liable for a forgery. It merely provides that under certain circumstances, such as where the bank is presented with items bearing or purporting to bear the facsimile machine signature, the bank is authorized to pay such items.

April 27, 1999 District Court Order, page 11.

Any findings regarding whether NationsBank used ordinary care or was negligent when it paid the forged instruments would be premature. We remand the case to allow the parties to present a more fully developed record to the district court on this issue.

AFFIRMED in part, REVERSED in part and REMANDED to the district court to resolve whether the NationsBank acted with ordinary care when it processed the forged checks.