DALTON & MARBERRY, P.C.,
Appellant–Respondent,

v.

NATIONSBANK, N.A., Respondent–
Appellant.

No. 80723.

Supreme Court of Missouri,
En Banc.

Nov. 3, 1998.

Rehearing Denied Jan. 5, 1999.

Thomas M. Schneider, Columbia, for appellant-respondent.

Ronald A. Norwood, St. Louis, Marvin E. Wright, Susan Ford Robertson, Columbia, for respondent-appellant.

MICHAEL A. WOLFF, Judge.

This is a common law duty of inquiry action brought by Dalton & Marberry, P.C., against NationsBank. The trial court ruled in favor of Dalton & Marberry, following a jury verdict, and awarded $130,334.00. This appeal is before the Court upon transfer, after opinion, from the Court of Appeals, Western District.

Dalton & Marberry, an accounting firm in Columbia, Missouri, maintained an account at NationsBank (formerly known as Boatmen's Bank of Mid–Missouri) to perform payroll services for its clients. Between November 1989 and April 1994 Janet Hollandsworth, a former Dalton & Marberry staff accountant, embezzled $130,334.00 from this payroll account. Hollandsworth carried out the scheme by having Dalton & Marberry checks drawn on the bank signed by an appropriate signatory. After obtaining a signature on a check, which was made payable to the bank, Hollandsworth would take the check to the bank and obtain a blank cashier's check or a money order. She did this approximately 93 times in four and one-half years. Dalton & Marberry officers did not know about the scheme until May 1994. During the entire period, the bank did not inquire as to whether Hollandsworth was authorized to obtain blank cashier's checks or money orders in exchange for Dalton & Marberry's checks made out to the bank and drawn upon the bank.

Dalton & Marberry sued the bank, alleging negligence and conversion. Prior to trial, Dalton & Marberry dropped its conversion claim. The negligence claim, which was tried, alleged that the bank failed in its common law duty to inquire as to the authority of Hollandsworth to obtain money, by cashier's check or money order, from the account. Dalton & Marberry's legal theory is based upon *Martin v. First National Bank in St. Louis*, 358 Mo. 1199, 219 S.W.2d 312 (Mo. 1949), although it somewhere along the way shifted from a tort theory to a contract theory. Either way, the theory is premised on *Martin*.

The bank asserted a number of affirmative defenses. Its main defense was that it qualified as a holder in due course, under section 400.3–306, RSMo 1994, which would bar Dalton & Marberry from recovery in negligence. The bank further asserted that Dalton & Marberry was contributorily negligent and

estopped from recovery because it failed to discover the embezzlement scheme for a period of over four and one-half years.

Prior to trial, the trial court excluded evidence of contributory negligence from the case, on the authority of *Martin, supra.* The trial court's verdict directing instruction submitted the bank's duty to inquire as follows:

> Your verdict must be for plaintiff if you believe:
>
> First, defendant failed to inquire of Dalton & Marberry as to the authority of Janet Hollandsworth to obtain blank money orders and cashier's checks, and
>
> Second, as a direct result of such conduct plaintiff sustained damage, unless you believe plaintiff is not entitled to recover by reason of Instruction Number 7.

Instruction Number 7, which is referred to as the bank's "apparent authority" affirmative defense, provides:

> Your verdict must be for defendant if you believe that Janet Hollandsworth, in presenting checks to defendant Boatmen's Bank of Mid–Missouri and obtaining cashier's checks and money orders, acted within the course and scope of agency as a staff accountant with plaintiff.
>
> Acts of Janet Hollandsworth were within the "scope and course of agency" as that phrase is used in this instruction if:
>
> First, the conduct of plaintiff Dalton & Marberry was such that an ordinarily careful and prudent person would believe that Janet Hollandsworth had authority to perform such acts on behalf of plaintiff or its clients, and
>
> Second, defendant Boatmen's Bank of Mid–Missouri reasonably relied on such conduct of plaintiff Dalton & Marberry at the time of the transactions mentioned in the evidence.

While Dalton & Marberry's pleadings denominated this as a negligence action, its jury instructions— which were given by the trial court— did not submit the issue of negligence, although the court's verdict form refers to this as a "negligence" action. The bank objected to the failure to submit negligence as part of the plaintiff's verdict directing instruction, but the bank does not directly present that point in this appeal. The bank's point on this appeal, relating to negligence, asserts error in the trial court's failure to allow evidence on the issue of contributory negligence.[1]

The jury returned a verdict in favor of Dalton & Marberry in the amount of $130,334.00. The trial court rejected Dalton & Marberry's request for prejudgment interest in the amount of $45,831.41; Dalton & Marberry sought prejudgment interest either on the theory that this is a "contract" action, under which section 408.020, RSMo 1994, would apply, or a "tort" action to which section 408.040, RSMo 1994, would apply. The bank sought credit for $37,084.57, the amount of restitution paid by Hollandsworth to Dalton & Marberry, which suffered losses on the embezzlement greatly in excess of the amounts withdrawn wrongfully from the bank. The bank's request for this credit was also rejected. The bank's motion for judgment notwithstanding the verdict and motion for new trial were overruled.

For reasons set forth below, we believe the common law claim for relief recognized in the *Martin* case survives, and in this case it is not subject to the holder in due course defense. However, the claim is subject to the defense of actual and apparent authority. We agree with the trial court's decision that contributory negligence is not a bar to recovery. However, the defendant bank should have been given the opportunity to present evidence that its breach of duty was not the cause of all of plaintiff's losses and that plaintiff's own conduct contributed to cause some part of its losses. For this reason, we reverse and remand to the trial court for a new trial.

### The Bank's Common Law Duty

The common law duty of inquiry recognized in the *Martin* case is still good law. *Martin* arose from facts remarkably

---

1. The position of the bank appears to be strategic, not inadvertent: To treat this as a negligence action raises the contributory negligence point and works to deny plaintiff prejudgment interest. The plaintiff, by contrast, now characterizes its claim as a contract claim, hoping to get prejudgment interest.

similar to the present case: Plaintiff's claim was that three checks drawn on and payable to the defendant bank were charged against plaintiff's account without plaintiff's authority or consent. *Martin, supra* at 314. There, as here, a miscreant bookkeeper obtained valid signatures of persons authorized to sign checks for the plaintiff, presented the checks payable to the bank, and received cashier's checks in the amount of the checks presented. *Id.* The basis of the plaintiff's claim in *Martin*, as here, is that the bank was negligent in failing to inquire as to the authority of the person who presented the checks made payable to the bank and received cashier's checks in exchange. *Id.* The Court stated that a payee bank is liable where a check is made payable to its order and the proceeds are diverted to a use other than that of the drawer-depositor, if the bank does so without authority emanating from the drawer-depositor. *Id.* at 318. *See also, Utley Lumber Co. v. Bank of Bootheel*, 810 S.W.2d 610, 612 (Mo.App.1991). A payee bank is liable if it fails to inquire as to the authority of an agent of the drawer-depositor who wrongfully diverts the proceeds of a check made payable to the order of the bank itself. *Id. See*, C.J.S. Banks and Banking, vol. 9, section 327, pp. 316–317 (1996). Missouri's common law duty of inquiry recognized in *Martin* is consistent with the majority of other jurisdictions. *See, e.g., Transamerica Insurance Co. v. United States National Bank*, 276 Or. 945, 558 P.2d 328, 333 (Or.1976).[2]

Thus, in this case, the bank can be liable for failing to inquire as to the authority of Hollandsworth, the employee who embezzled the money from the checks made payable to the bank.

### The Holder in Due Course Doctrine

■ The bank's major contention is that it was shielded from liability by the holder in

due course doctrine. Missouri's adoption of the Uniform Commercial Code (U.C.C.) did not extinguish the common law duty involved in this case. Section 400.3–302, RSMo 1994, states that:

(a) Subject to subsection (c) and Section 400.3–106(d), "holder in due course" means the holder of an instrument if:

(1) the instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity; and

(2) the holder took the instrument (i) for value, (ii) in good faith, (iii) without notice that the instrument is overdue or has been dishonored or that there is an uncured default with respect to payment of another instrument issued as part of the same series, (iv) without notice that the instrument contains an unauthorized signature or has been altered, (v) without notice of any claim to the instrument described in Section 400.3–306, and (vi) without notice that any party has a defense or claim in recoupment described in Section 400.3–305(a) . . .

(g) This section is subject to any law limiting status as a holder in due course in particular classes of transactions.

A person other than a holder in due course who takes an instrument is subject to a claim of a property or possessory right in the instrument or its proceeds, including a claim to rescind a negotiation and to recover the instrument or its proceeds. Section 400.3–306, RSMo 1994. A person having rights of a holder in due course takes free of such claims to the instrument. *Id.*

---

**2.** *See, also, Federal Ins. Co. v. NCNB National Bank of North Carolina*, 958 F.2d 1544, 1549 (11th Cir.1992) (under Florida law, "[a] bank that receives a check payable to it, where the drawer is not indebted to it, has a duty, before paying the check, to inquire whether the drawer's agent is authorized to negotiate the check, since the bank is authorized to negotiate the check only in accordance with the drawer's intention."); *Fields v. Roark*, 630 So.2d 1359 (La. App.1994); *Rose Lee Mfg., Inc. v. Chemical Bank*,

149 Misc.2d 638, 563 N.Y.S.2d 965 (N.Y.1990); *PWA Farms, Inc. v. North Platte State Bank*, 220 Neb. 516, 371 N.W.2d 102 (Neb.1985); *Bullitt County Bank v. Publishers Printing Co., Inc.*, 684 S.W.2d 289 (Ky.App.1984); *Allis Chalmers Leasing Services Corp. v. Byron Center State Bank*, 129 Mich.App. 602, 341 N.W.2d 837 (Mich.App. 1983); *Arvada Hardwood Floor Co. v. James*, 638 P.2d 828 (Colo.App.1981); *Bank of Southern Maryland v. Robertson's Crab House, Inc.*, 39 Md. App. 707, 389 A.2d 388 (Md.App.1978).

Under the state's negotiable instruments law that pre-dated the U.C.C. and was in effect at the time of the *Martin* decision, a payee probably could not be a holder in due course. *See, e.g., Long v. Mason,* 273 Mo. 266, 200 S.W. 1062, 1065 (Mo banc 1918). The drafters of the U.C.C. did not categorically exclude a payee from holder-in-due-course status, but cautioned: "[t]he payee of an instrument can be a holder in due course, but use of the holder-in-due-course doctrine by the payee of an instrument is not the normal situation." Comments, section 400.3–302, RSMo 1994. Although it is appropriate in a few instances to allow the payee of an instrument to assert rights as a holder in due course, "[i]n the typical case the holder in due course is not the payee of the instrument. Rather, the holder in due course is an immediate or remote transferee of the payee." *Id.*

Furthermore, a payee who takes an instrument directly from the drawer's agent rarely becomes a holder in due course because such a payee will "usually have notice of claims and defenses by virtue of the fact that he has dealt directly with the maker." C.J.S., Bills and Notes, vol. 10, section 184, p. 344 (1996). The bank's knowledge that it gave Hollandsworth the blank money orders and cashier's checks, and its failure to inquire as to Hollandsworth's authority, put it on notice of Dalton & Marberry's potential defense.

Cases from other jurisdictions clearly hold that a drawee bank that is the payee, and under a duty to inquire, cannot be a holder in due course. *See, e.g., Allis Chalmers Leasing v. Byron Ctr. St. Bank,* 129 Mich.App. 602, 341 N.W.2d 837, 840 (Mich.App.1983); *Sun 'n Sand, Inc. v. United California Bank,* 21 Cal.3d 671, 148 Cal.Rptr. 329, 582 P.2d 920 (Cal.1978); and *Von Gohren v. Pacific National Bank of Washington* 8 Wash.App. 245, 505 P.2d 467, 473–74 (Wash.App.1973). *See also, Robbins v. Passaic Nat. Bank &*

*Trust Co.,* 109 N.J.L. 250, 160 A. 418, 419 (N.J.App.1932); and *Paine v. Sheridan Trust & Savings Bank,* 342 Ill. 342, 174 N.E. 368 (Ill.1930).[3]

The holder in due course doctrine is inapplicable in this case.

### Apparent Authority and Other Defenses

■ In Missouri, a payee bank may avoid liability by proving that the agent has actual or apparent authority from the drawer-depositor. *Martin, supra* at 318. The bank contends that it submitted undisputed evidence that established that Dalton & Marberry clothed Hollandsworth with sufficient authority to compel the conclusion, as a matter of law, that she possessed apparent authority to bind Dalton & Marberry to these transactions.

■ Apparent authority exists only to the extent that it is reasonable for a third person dealing with the agent to believe that the agent is authorized. *Graue v. Missouri Property Ins. Placement Facility,* 847 S.W.2d 779, 783 (Mo.1993). Here, there is no contention that Hollandsworth had actual authority. The issue of apparent authority was submitted to the jury as an affirmative defense, and the verdict was against the defendant bank. Upon remand for a new trial, this defense may again be submitted.

■ The bank further asserts that in order to prove that a bank breached its duty to inquire in accepting checks made payable to the bank, a plaintiff must also prove that a bank knew that the check proceeds were being used for the personal benefit of the defalcating employee. The bank contends that Dalton & Marberry is precluded from recovery here because it failed to prove that it had such knowledge. The common law duty of inquiry does not require the bank to have actual knowledge as proposed above. Of course, if the bank has such knowledge

---

**3.** The cases cited by the bank that have applied the holder in due course doctrine to payee banks are not directly on point. *See, e.g., Gino's of Capri, Inc. v. Chemical Bank,* 187 A.D.2d 71, 73, 592 N.Y.S.2d 682 (N.Y.App.1993) (none of the embezzled checks were deposited with the bank or even delivered for such purpose); *Johnstown Manufacturing, Inc. v. Haynes,* 53 Ohio App.3d 42, 557 N.E.2d 1221 (Oh.App.1988) (holder in due course was applicable because bank did not breach its duty to inquire in that bank successfully asserted the affirmative defense of apparent authority); and *G.F.D. Enterprises v. Nye,* 37 Ohio St.3d 205, 525 N.E.2d 10 (Oh.1988) (dealt with unauthorized and forged instruments).

and still pays the defalcating employee, then its liability will not be questioned. *Utley, supra*. The duty of inquiry does not presuppose actual knowledge of embezzlement but it is there for banks to inquire as to the possibility of such occurring.

■ The bank also claims that the corporate resolution by Dalton & Marberry authorizes the transactions and protects the bank from liability. However, the corporate resolution says nothing about the bank taking checks drawn by the employer and giving blank money orders and cashier's checks to an employee who is not the drawer of the checks. Simply put, a corporate resolution establishing the bank as depository for the corporation's funds does not operate to insulate the bank from liability for its negligence.

## Contributory Negligence and Related Concepts

■ The bank further contends that the trial court improperly excluded its evidence in support of its defense of contributory negligence and estoppel because such evidence is admissible and establishes viable affirmative defenses. The bank asserts that Dalton & Marberry was negligent in numerous ways, such as its failure to review its monthly statements and cancelled checks for four and one-half years and its failure to properly supervise and adopt internal control procedures. In addition, the bank asserts that exercise of ordinary care by Dalton & Marberry would have prevented Hollandsworth's embezzlement scheme.

The Court in *Martin* upheld the rejection of a contributory negligence defense, on the basis that the negligence on the part of the plaintiff that is submitted in defense must be shown to have caused or induced the issuance of the cashier's checks. In rejecting the contributory negligence defense, this Court said:

> Mere possession of such a check payable to the bank would not authorize such payment. We think such negligence was remote and not the direct, immediate and proximate cause of the issuance of the cashier's check.

*Martin, supra* at 319.

The Court further rejected a defense of contributory negligence on the part of the plaintiff in "making no objections to the bank's monthly statements" and in failing to examine and check the statements. Again, the Court held that such a defense would not be recognized unless there was evidence that the negligence submitted "caused or induced the issuance of the cashier's checks." *Id.*

However, we are mindful that, in more modern terms, contributory negligence concepts might readily be denominated as comparative fault and not be a complete bar to recovery that such negligence would have been in 1949. *Martin* arose in the era when contributory negligence was an absolute bar to recovery. During this era, an appellate court could examine the evidence and find contributory negligence as a matter of law, rather than as a matter of fact to be left to the jury. Thus, an appellate court could find that evidence establishing contributory negligence defeated plaintiff's claim; or, as in *Martin*, a court could hold as a matter of law that the causal connection between the customer's negligence and the wrong committed by the bank was too remote to act as a bar to recovery.

Cast in modern, comparative terms, it is appropriate to allow the bank to submit evidence to show that its failure to perform its duty was not the direct cause of some of the customer's losses. This approach is consistent with the U.C.C.'s shift to comparative fault concepts with regard to the relationship between the bank and its customers. Sections 404.3–406 and 400.4–406, RSMo 1994, of the U.C.C., dealing with altered or forged instruments, are instructive though not directly applicable. These sections impose a duty on the bank's customer to examine its checks, after they are returned by the bank, to discover alterations or forgeries. *Id.* When the customer neglects that duty, the loss is allocated between the bank that failed to exercise ordinary care and the customer who failed to discover the unauthorized payment "to the extent to which the failure of each to exercise ordinary care contributed to

the loss," section 400.3–406, RSMo 1994. *See, e.g,* Zekan, "Comparative Negligence Under the Code: Protecting Negligent Banks Against Negligent Customers," 26 U. Mich. J.L. Ref. 125 (1992). The statutes create a duty on the part of the customer in situations involving forgery and alteration, but they do not create a duty for the customer to discover the type of scam involved here.[4] Nor, of course, does the common law create such a duty, as *Martin* demonstrates. Nevertheless, the customer's failure to protect its own interests, and to follow generally accepted business practices, undoubtedly can cause or contribute to cause some of the customer's losses. When we adopt a comparative approach we do not suggest that a jury be asked to apportion losses by percentages. The jury would determine at what point in time a reasonable customer would have discovered the scam and prevented further losses, allocating to the bank those losses occurring before that point in time. In other words, the jury would determine which losses were proximately caused by the bank's breach of duty (and which were not) of the 93 checks presented by Hollandsworth and paid by the bank in the four and one-half year period.

In this case, the bank offered evidence to show what a reasonable and prudent bank customer would do, in particular, a reasonable and prudent bank customer that is an accounting firm. This evidence should have been admitted. This evidence may show that the customer's own conduct and practices caused some of the losses that the customer suffered. It would then be a jury question to ascertain, as a matter of causation, which losses were attributable to the bank's failure to perform its duty, and which were not. *See Transamerica Insurance Co., supra,* at 328.

The bank, however, offered its evidence on the issue of contributory negligence as a bar to recovery—a defense foreclosed by *Martin.* The evidence could have been offered and should have been received to prove that at least some of the losses were caused by the

customer's conduct. One of the essential elements of a *Martin* claim is causation. The verdict directing instruction, quoted above, and damages instruction require finding that the Dalton & Marberry's loss be the "direct result" of the bank's failure to inquire. Upon remand, the jury may be instructed to apportion the losses by determining how much of the total loss was caused by the bank's breach of its duty, if the jury does find negligence, and what losses were the result of the customer's own conduct. The excluded evidence, which will be available in a new trial, as to the practice of reasonable and prudent bank customers may be helpful to the jury in making this determination.

In the *Martin* case, the customer's failure in three instances to discover the scam was held not to be a proximate cause of the customer's loss. *Martin, supra* at 319. Here, there were 93 checks over a four and one-half year period. If the jury finds that the bank was negligent, and that the bank's apparent authority defense fails, the jury would presumably award some damages to Dalton & Marberry. We would be unable to say as a matter of law at what point Dalton & Marberry should have discovered this scheme and cut its losses. Thus, we should leave it to the jury, guided by appropriately modified comparative fault and damages instructions, to determine what losses were caused by the bank's failure to inquire and what losses were the result of Dalton & Marberry's own conduct.

### Prejudgment Interest and Restitution Issues

Dalton & Marberry argues that its cause of action was contractual, that it is, therefore, entitled to prejudgment interest, or alternatively, if the cause of action was negligence, it is entitled to prejudgment interest under section 408.040, RSMo 1994. For reasons discussed above, applying negligence concepts to this claim, we do not adopt plaintiff's characterization of this as a contract claim. Since this case is being remanded for a new trial, we leave to the trial court to determine

---

**4.** The U.C.C. provisions may be relevant in one sense: if the customer had performed its duty to examine its checks in a timely fashion, Hollandsworth's scam may have been detected earlier than four and one-half years.

There is another U.C.C. provision that also could apply here: section 400.3–307, RSMo 1994, "notice of breach of fiduciary duty." However, both parties, at oral argument, declined to apply that section.

after verdict, if the verdict is for Dalton & Marberry, whether section 408.040 authorizes prejudgment interest. *See Emery v. Wal–Mart,* 976 S.W.2d 439 (Mo. banc 1998).

The bank also contends that the trial court erred in failing to give it credit against the judgment for the $37,084.57 that Hollandsworth paid in restitution to Dalton & Marberry. The bank argues that any payment made by a joint tortfeasor in restitution to the plaintiff must be deducted from any final judgment against another joint tortfeasor. Generally, when a debtor owes on various accounts and makes partial payment against the total, the debtor making the payment may specify the debt or account to which the payment will apply. *Messmer v. Juden,* 812 S.W.2d 269, 270 (Mo.App.1991); *Glasco Electric Co. v. Best Electric Co.,* 751 S.W.2d 104, 110 (Mo.App.1988): and *Berns Bros., Inc. v. Keller,* 703 S.W.2d 507, 509 (Mo.App.1985). However, if the debtor fails to do so, the creditor may apply the partial payment in any manner necessary and appropriate to protect its interests. *Id.* In this case, the record indicates that Hollandsworth returned $37,084.57 to Dalton & Marberry. According to Dalton & Marberry, the money was returned without direction from Hollandsworth and it applied the money to a debt it owed one of its clients, Delta Gamma, from whom Hollandsworth embezzled money. The money that Hollandsworth embezzled from Delta Gamma's account was in excess of the $37,084.57 returned. The trial court properly rejected the bank's contention. After remand, however, we leave to the trial court to determine, under the principles stated here, whether any payments made up to that point to Dalton & Marberry by Hollandsworth should be credited to the bank.

The judgment of the trial court is reversed, and the cause is remanded for a new trial consistent with this opinion.

BENTON, C.J., PRICE, LIMBAUGH, WHITE and HOLSTEIN, JJ., and PARRISH, Special Judge, concur.

COVINGTON, J., not participating.