PRESTIGE IMPORTS, INC., & others[1] *vs.* SOUTH WEYMOUTH
SAVINGS BANK.

No. 00-P-563.

Norfolk. April 16, 2008. - November 19, 2009.

Present: McHUGH, KATZMANN, & GRAINGER, JJ.

*Practice, Civil,* Summary judgment, Judicial discretion, Review of interlocu-
tory action. *Bank. Uniform Commercial Code,* Bank, Defenses, Good faith,
Notice. *Negotiable Instruments,* Defenses, Holder in due course. *Negligence,*
Bank, In cashing check. *Fraud. Fiduciary. Words,* "Notice," "Knowledge."

In a civil action, a Superior Court judge did not abuse her discretion in hear-
ing and deciding a renewed motion for summary judgment, where an
earlier decision on a motion for summary judgment (made by a different
judge) was interlocutory, and therefore, the judge hearing the renewed mo-
tion had the power to modify the decision prior to entry of a final judgment.
[776]

In a civil action arising out of the defendant bank's alleged mishandling of
certain checks, a Superior Court judge properly granted summary judgment
in favor of the bank, where there was no genuine issue of material fact
regarding the bank's status as a holder in due course, in that the bank, which
was a holder of the checks in question and had taken them for value in good
faith, had no notice that the person presenting the checks was acting without
authority or in some other improper fashion, either from a remitter statement
on the face of each check or from the bank's general knowledge of the
presenter's suspicious behavior. [776-790]

CIVIL ACTION commenced in the Superior Court Department on
February 1, 1991.

The case was heard by *Elizabeth Butler,* J., on renewed mo-
tions for partial summary judgment, and entry of separate and
final judgment was ordered by *Charles M. Grabau,* J.

*George C. Deptula* for the plaintiffs.

*J. William Chamberlain, Jr.,* for the defendant.

McHUGH, J. Prestige Imports, Inc. (Prestige), had a banking
relationship with South Shore Bank (SSB). Using Prestige's

[1]Helmut Schmidt and Renate Schmidt.

funds, Wajahat Malick, Prestige's comptroller, fraudulently procured treasurer's checks from SSB and used them to pay personal loans he had obtained from South Weymouth Savings Bank (South Weymouth). After the fraud was discovered and related litigation began, Prestige and Helmut and Renate Schmidt[2] (collectively, Prestige) impleaded South Weymouth and asserted claims for mishandling the SSB checks. Ultimately, a judge of the Superior Court granted South Weymouth's motion for summary judgment and dismissed the Prestige claims. Prestige appeals, and we affirm.

*Background.* Viewing the record in the requisite fashion, see, e.g., *New Habitat, Inc.* v. *Tax Collector of Cambridge*, 451 Mass. 729, 731 (2008), it appears that Prestige, a Weymouth automobile dealership, financed its purchase of new vehicles with "floor plan" financing from SSB. Under the plan, SSB provided Prestige with a revolving line of credit, advancing funds to pay for, and taking a security interest in, each vehicle the dealership acquired. Prestige paid monthly interest until the vehicle was sold and then paid SSB the balance due.

In 1987, Prestige hired Malick as its comptroller. Malick's duties included depositing checks at SSB pursuant to a depositary agreement that was part of the financing plan. On nine occasions between February and October of 1990, however, Malick exchanged Prestige checks intended as payment on SSB loans for SSB treasurer's checks made payable to South Weymouth, which had no banking relationship with Prestige. All the Prestige checks Malick used in the scheme were made payable to SSB, and all were properly cosigned by Prestige owner Helmut Schmidt. A "remitter" line on the face of each SSB treasurer's check stated that the check had been "purchased by" Prestige. The nine checks totaled $432,895.

Malick presented the nine checks to South Weymouth with instructions to deposit them into his personal account, where the proceeds were used, at least in part, to repay loans he had obtained from South Weymouth. The instructions were part of a fraudulent scheme through which Malick, during a two-year spree lasting from 1988 to 1990, embezzled over $1.5 million from Prestige.

---

[2]Helmut was the president of Prestige Imports, and Renate was a guarantor, with Helmut, on the SSB loans.

For Prestige, Malick's fraud was financially ruinous. Various lawsuits ensued, one of which was this action, in which Prestige alleged that South Weymouth was negligent in accepting the SSB treasurer's checks and in failing to investigate Malick's transactions.[3]

On the basis of those facts, and others we shall explore at appropriate points in our discussion, South Weymouth eventually filed a motion for summary judgment, which a Superior Court judge denied. South Weymouth later renewed its summary judgment motion, claiming that (i) it was a holder in due course and its status as such barred Prestige's negligence claim; (ii) as a holder in due course, it could invoke the finality rule, see G. L. c. 106, § 3-418, inserted by St. 1957, c. 765, § 1,[4] to preclude recovery; (iii) it had no duty to review the remitter line because it was the payee of the checks; and (iv) a bank owes a duty only to its customers, not to third parties.

A second Superior Court judge allowed the motion. She concluded that the summary judgment papers left no genuine issue of material fact as to South Weymouth's status as a holder in due course of the SSB checks and, as a consequence, saw no need to address the other grounds for summary judgment South Weymouth had asserted. Because the judge saw in the papers no real dispute as to South Weymouth's status as a holder for value of the relevant checks, she focused chiefly on the question whether

---

[3]This case began as a third-party claim. When Prestige encountered financial difficulties, SSB sued it for various contractual breaches and other alleged wrongs. See our decision in *Bank of America, N.A.* v. *Prestige Imports, Inc., ante* 741 (2009). Prestige counterclaimed and filed third-party claims against South Weymouth. After South Weymouth obtained summary judgment in its favor, a judge of the Superior Court ordered entry of final judgment pursuant to Mass.R.Civ.P. 54(b), 365 Mass. 821 (1974). Oral argument was initially held on July 1, 2002, but the appellate proceedings were then stayed pending resolution of the litigation between SSB and Prestige. When that litigation ended and appeals were taken, oral argument in this case was heard again.

[4]Because the transactions in question here took place in 1990, references to the Uniform Commercial Code (Code) are, unless otherwise noted, references to the version inserted by St. 1957, c. 765, § 1. That version replaced the Uniform Negotiable Instruments Law and remained in effect, with some amendments, until 1998, when Massachusetts adopted the 1990 Code revisions. See St. 1998, c. 24, § 8. Though not controlling here, the revisions adopted in 1998 and accompanying official comments are in some instances helpful to an understanding of the 1957 provisions. The revised version, when referred to, will be described as the "1998 U.C.C."

South Weymouth had notice of Prestige's claims. In that regard, she found that the papers filed by South Weymouth eliminated any genuine issue of material fact, see *Smith* v. *Massimiano*, 414 Mass. 81, 85-86 (1993), and that Prestige had presented "nothing more than conclusory assertions" in an effort to rebut South Weymouth's showing. Further, she concluded that Prestige's name on the remitter line "[did] not, as a matter of law, establish that South Weymouth was thereby placed on notice of a defense or claim."

On appeal, Prestige claims that there is a genuine issue of material fact whether South Weymouth was a holder in due course and whether it negligently allowed Malick to deposit the treasurer's checks into his own account. It also claims that the second Superior Court judge abused her discretion in revisiting the first judge's denial of South Weymouth's summary judgment motion.

*Discussion.* 1. *Abuse of discretion.* The second Superior Court judge did not abuse her discretion by hearing and deciding South Weymouth's renewed motion for summary judgment. "Although a judge should not lightly undo the work of another judge," a summary judgment decision is interlocutory, and a judge has the power to modify the decision until a final judgment enters. *Riley* v. *Presnell*, 409 Mass. 239, 242 (1991). Accord *King* v. *Globe Newspaper Co.*, 400 Mass. 705, 707-708 (1987), cert. denied, 485 U.S. 940 and 485 U.S. 962 (1988).

Proceeding to trial on a case that, as a matter of law, cannot possibly succeed expends public and private resources in a manner that cannot be justified either by considerations of collegial deference or by a desire to prevent "shopping" for a judge more favorably inclined to the shopper's position. That is not to say that a judge is required to revisit another judge's denial of a summary judgment or any other motion. It is to say that, absent unusual circumstances of a type that this case does not present, revisiting another judge's interlocutory order does not amount to an abuse of discretion.

2. *Holder in due course.* Substantively, if South Weymouth is a "holder in due course" of the SSB checks, it is entitled to judgment on the claims Prestige has asserted, for the status of holder in due course not only cuts off defenses on the checks themselves but cuts off other remedies as well. See G. L. c. 106,

§§ 3-207(2) and 3-306(*a*); Official Comment 2 to Uniform Commercial Code § 3-306, 2A part 1 U.L.A. 504 (Master ed. 2004) (prior art. 3) (claims with respect to which holder in due course is immune include "not only claims of legal title [to the check], but all liens, equities, or other claims of right against the instrument or its proceeds. [The immunity extends to] claims to rescind a prior negotiation and to recover the instrument or its proceeds").

Although it is somewhat unusual, a payee like South Weymouth may be a holder in due course. See G. L. c. 106, § 3-302(2); Official Comment 2 to Uniform Commercial Code § 3-302, 2A part 1 U.L.A. 343, *supra.* See also *Boston Steel & Iron Co.* v. *Steuer,* 183 Mass. 140, 143 (1903); *New Bedford Inst. for Sav.* v. *Gildroy,* 36 Mass. App. Ct. 647, 651 (1994).[5] The question whether a payee or any other person takes a check as a holder in due course turns on four subsidiary questions, i.e., whether the person is (a) a "holder" who takes the check (b) "for value" and (c) "in good faith" and (d) "without notice . . . of any defense against or claim to it on the part of any person." G. L. c. 106, § 3-302(1).

a. *Preliminaries.* There is little dispute as to three of the four subsidiary questions. First, the Uniform Commercial Code (Code) defines a "holder" as "a person who is in possession of . . . an instrument[6] . . . drawn . . . to him or his order." G. L. c. 106, § 1-201(20).[7] "It is inherent in the character of negotiable paper that any person in possession of an instrument

[5]Normally, the payee and the drawer deal with each other directly, and as a consequence, the payee has knowledge of the drawer's defenses and claims. Under those circumstances, the payee cannot be a holder in due course. See G. L. c. 106, § 3-302; Official Comment 2 to Uniform Commercial Code § 3-302, 2A part 1 U.L.A. 343 (prior art. 3). Compare Official Comment 4 and case 1 to Uniform Commercial Code § 3-302, 2 U.L.A. 132-133 (Master ed. 2004) (revised art. 3) (§ 3-302[2] was omitted in the revision "because it is surplusage and may be misleading"). "On the other hand, where [as here] the payee had no direct dealing with the drawer of a check but dealt through a remitter or intermediary, the payee might be a holder in due course." 1 Bailey & Hagedorn, Brady on Bank Checks § 9.04, at 9-5 (rev. ed. 2009).

[6]An "instrument" is simply "a negotiable instrument," G. L. c. 106, § 3-102(1)(*e*), one form of which is a check. G. L. c. 106, § 3-104(2)(*b*), as amended by St. 1958, c. 542, § 5.

[7]In considering a bank's status as "holder" of a check deposited by its customer, it is helpful to remember that the relationship between a bank and its depositor is the relationship between creditor and debtor, not the relationship

which by its terms runs to him is a holder, and that anyone may deal with him as a holder." Official Comment 2 to Uniform Commercial Code § 3-207, 2A part 1 U.L.A. 317 (Master ed. 2004) (prior art. 3). See *New Bedford Inst. for Sav.* v. *Gildroy, supra* at 652 ("The payee of an instrument in its possession is always a holder"). South Weymouth therefore became the holder of the SSB checks when Malick delivered them for deposit to his account.[8]

Second, a holder takes an instrument for "value" when it takes "the instrument in payment of or as security for an antecedent claim against any person whether or not the claim is due." G. L. c. 106, § 3-303(*b*). A holder also takes the instrument for value "to the extent that . . . he acquires a security interest in or a lien on the instrument otherwise than by legal process." G. L. c. 106, § 3-303(*a*). A bank acquires a security interest in an instrument "deposited in an account" when credit the bank has given for the instrument has been "withdrawn or applied." G. L. c. 106, § 4-208(1)(*a*).[9] Therefore, to the extent that South Weymouth took the checks in payment of loans it had made to Malick, it gave value for them. To the extent that it did not, it gave value when Malick actually withdrew the proceeds. In either event, Prestige does not argue that South Weymouth failed to give value for the checks.

---

between a principal and agent or between a trustee and beneficiary. "Once payment on a check has been delivered to a collecting bank, the collecting bank and its customer have only a debtor-creditor relationship. . . . The customer does not have a right to the 'specific fund[s]' transferred to the collecting bank." *Gossels* v. *Fleet Natl. Bank*, 453 Mass. 366, 372 (2009).

[8]Malick's delivery of the checks to South Weymouth also was a "negotiation," i.e., "the transfer of an instrument in such form that the transferee becomes a holder. If the instrument is payable to order it is negotiated by delivery with any necessary indorsement; if payable to bearer it is negotiated by delivery." G. L. c. 106, § 3-202(1). Although the SSB checks were payable to the order of South Weymouth, no indorsement was necessary for negotiation because, upon delivery, South Weymouth became the holder by definition.

[9]A bank also acquires a security interest "in [the] case of an item for which it has given credit available for withdrawal as of right, to the extent of the credit given whether or not the credit is drawn upon . . . or . . . there is a right of charge-back." G. L. c. 106, § 4-208(1)(*b*). It is unclear from the record whether credits South Weymouth gave Malick upon deposit of the SSB checks were available for Malick to withdraw as of right before South Weymouth collected the proceeds. However, neither party suggests that anything pertinent to the outcome of this case turns on that issue.

Third, although Prestige claims that South Weymouth negligently handled the checks, it does not claim here, nor did it claim in the Superior Court, that South Weymouth dealt with the checks other than in "good faith," a subjective standard requiring "honesty in fact." See G. L. c. 106, § 1-201(19); *Industrial Natl. Bank of R.I.* v. *Leo's Used Car Exch., Inc.*, 362 Mass. 797, 801 (1973) ("Nothing in the definition [of good faith] suggests that in addition to being honest, the holder must exercise due care"). See generally *Demoulas* v. *Demoulas*, 428 Mass. 555, 575 (1998) ("The term '[g]ood faith' means 'honesty in fact in the conduct or transaction concerned.' . . . A party must show that he or she had a subjective honest belief in the legitimacy of the transaction"). "There is no element of due care in the concept of good faith. . . . Nor is there any requirement of commercial reasonableness in the Code's definition of 'good faith.' " *McCarthy, Kenney & Reidy, P.C.* v. *First Natl. Bank of Boston*, 402 Mass. 630, 635 (1988). Whatever else South Weymouth may have done or failed to do, there is neither an allegation nor a suggestion in the record that it was a party to Malick's malefactions or otherwise dealt with the SSB checks dishonestly.[10]

b. *Notice of claims or defenses.* On this record, then, the question of South Weymouth's status as a holder in due course reduces itself to whether there are genuine issues of material fact regarding whether South Weymouth had "notice" that Malick was acting without authority or in some other improper fashion when he presented the SSB checks for deposit. "Notice" under the Code consists of actual knowledge of a fact, receipt of a notice or notification of the fact, or reason to know of the fact from all of the facts and circumstances known at a relevant time. See G. L. c. 106, § 1-201(25).

---

[10]The 1998 U.C.C. contains a revised definition of "good faith" applicable to negotiable instruments. The revised definition provides that "good faith" is "honesty in fact and the observance of reasonable commercial standards of fair dealing." G. L. c. 106, § 3-103(*a*)(4) (1998). Nevertheless, the official comment makes clear that the definition has not expanded the concept of "good faith" to include failure to use reasonable care. "[F]air dealing," the comment says, "is concerned with the fairness of conduct rather than the care with which an act is performed. Failure to exercise ordinary care . . . is an entirely different concept than failure to deal fairly in conducting the transaction." Official Comment 4 to Uniform Commercial Code § 3-103, 2 U.L.A. 37 (Master ed. 2004) (revised art. 3).

Because South Weymouth's claim to be a holder in due course is an affirmative defense to liability that might otherwise attach, South Weymouth ultimately has the burden of proof on the issue. See *Rockland Trust Co.* v. *South Shore Natl. Bank*, 366 Mass. 74, 79 (1974). At the summary judgment stage, though, the burden " 'is a slight one' that may be satisfied by [an] affidavit disclaiming any knowledge of [any] . . . defense[s] when the [checks] were negotiated." *A.I. Trade Fin., Inc.* v. *Laminaconiones de Lesaca, S.A.*, 41 F.3d 830, 836 (2d Cir. 1994).

South Weymouth has filed affidavits and deposition testimony of the requisite type. In response, Prestige urges that genuine issues of material fact regarding South Weymouth's notice arise from the remitter statement on the face of each check indicating that it had been "purchased by" Prestige and from South Weymouth's general knowledge of Malick's suspicious behavior, including the size and number of the checks Malick was presenting. We are unpersuaded.

i. *The facial notations on the checks*. The "purchased by" notation on the front of each SSB check was notice to South Weymouth, and to everyone else who handled the check, that Prestige was the check's "remitter." The 1998 version of the Code defines the "remitter" as "a person who purchases an instrument from its issuer if the instrument is payable to an identified person other than the purchaser." G. L. c. 106, § 3-103(11) (1998). Although that definition did not appear in the Code in force at the time the checks were negotiated, the term "remitter" did appear elsewhere in the Code, see, e.g., G. L. c. 106, § 3-102(1)(*a*) (" 'Issue' means the first delivery of an instrument to a holder or a remitter"), and the current definition is consistent with the common-law definition existing before the Code's adoption. See, e.g., *Boston Steel & Iron Co.* v. *Steuer*, 183 Mass. at 144.

A remitter's purchase of a treasurer's or cashier's check is typically designed to facilitate the purchase and sale of commercial goods. See, e.g., Official Comment 2 to Uniform Commercial Code § 3-201, 2 U.L.A. 102-103 (revised art. 3). However, even if the bank delivers the check to the purchasing remitter, the remitter is not a party to the instrument and he or she has neither a right to enforce it, see 1 Bailey & Hagedorn,

Brady on Bank Checks § 8.02, at 8-7 (rev. ed. 2009), nor a right to order the issuing bank to dishonor it for reasons arising out of the underlying commercial transaction. See, e.g., *Louis Falcigno Enterprises, Inc.* v. *Massachusetts Bank & Trust Co.*, 14 Mass. App. Ct. 92, 95 (1982) ("the policy in favor of reliability of bank checks requires a rule that the [issuing] bank be precluded from raising [most] contract defenses claimed here on behalf of its customer").[11]

Notwithstanding the remitter's limited rights to and on a treasurer's check, Prestige asserts that the appearance of Prestige's name on the remitter line put South Weymouth on notice of Prestige's claims to the checks or, at least, imposed on South Weymouth an obligation to inquire of Prestige before following Malick's instructions regarding disposition of the proceeds.

a. *Remitter's name as notice of the remitter's "claim" to the check.* Prestige relies on *In re Nordic Village, Inc.*, 915 F.2d 1049 (6th Cir. 1990), for the proposition that the appearance of Prestige's name on the remitter line was alone sufficient to put a holder such as South Weymouth on notice of Prestige's claims when Malick, the possessor of the check, instructed South Weymouth (the transferee) to use the check and its proceeds for purposes other than those that appeared to be consistent with Prestige's interests.

*Nordic Village* is a case in which a Nordic Village officer used Nordic Village funds to purchase a cashier's check payable to the Internal Revenue Service (IRS). The officer then delivered the check to the IRS with instructions to apply it to the outstanding tax liabilities of a separate corporate venture with which he was

---

[11]That is not to say that the remitter is entirely without rights. For example, the remitter is the owner of the check until he transfers it to someone else. See Official Comment 2 to Uniform Commercial Code § 3-201, 2 U.L.A. 102 (revised art. 3). As noted earlier, if the transfer is to the payee (here, South Weymouth), the transfer is a negotiation and the payee becomes the holder. See note 8, *supra*. Unless the payee is a holder in due course, a negotiation is "subject to rescission, the declaration of a constructive trust or any other remedy permitted by law." G. L. c. 106, § 3-207(2). See Maggs, Determining the Rights and Liabilities of the Remitter of a Negotiable Instrument: A Theory Applied to Some Unsettled Questions, 36 B.C. L. Rev. 619, 632-633 (1995). The Code does not provide the remedies "permitted by law." Instead, they are supplied by the nonCode law of the Commonwealth. See Official Comment 5 to Uniform Commercial Code § 3-207, 2A part 1 U.L.A. 317-318 (prior art. 3).

involved. *Id.* at 1050-1051. Nordic Village subsequently entered bankruptcy proceedings, and the bankruptcy trustee sought to recover the funds from the IRS under provisions of the Bankruptcy Code allowing recovery unless the IRS took the check "for value, in good faith and without knowledge of the voidable nature of the transfer." *Id.* at 1055. The court held that the trustee could recover, reasoning that

> "[t]he IRS gave value for the check by crediting it against [the officer's] outstanding tax liability. However, because of the words 'REMITTER: SWISS HAUS, INC.,' it cannot be said that the IRS acted without knowledge of the voidability of the transfer. It is not an ordinary business practice for corporate entities to pay one another's taxes. This notation is sufficient to place a reasonable person on notice that the transfer was illegitimate, and by extension, that it was voidable."

*Id.* at 1056.

*Nordic Village* was decided under the Bankruptcy Code, not under the Uniform Commercial Code. To the extent we are asked to apply its reasoning to the record before us, we decline to do so, for to expand the court's rationale to include any use of a treasurer's check that does not appear to be in the remitter's interests would destroy the check's commercial utility. "It is an assurance of negotiability tantamount to a cash transfer which a cashier's check represents. If we are to begin requiring parties to investigate, despite this representation of negotiability, we are subverting the purpose for which the cashier's check was proffered." *Wohlrabe* v. *Pownell,* 307 N.W.2d 478, 485 (Minn. 1981).

Concerns about preserving the assurance of negotiability lie at the heart of decisions that have declined to find notice of a remitter's claim from the mere appearance of the remitter's name in the remitter line. Thus, in another bankruptcy case, the court said that "[r]emitter notations on a cashier's check are 'information to the maker and not conditional or notice of the payee.' . . . [F]illing in of the remitter line on a cashier's check is akin to filling in of the memo line on a personal check; helpful, but not required, and of no legal effect." *In re Spears Carpet*

*Mills, Inc.*, 86 B.R. 985, 993 (W.D. Ark. 1987). See *Western Sur. Co.* v. *Friederichs*, 241 Minn. 492, 497-498 (1954) (under negotiable instruments law, statement on face of cashier's check stating "Dist. No. 14, Remitter" was insufficient to place payee on notice of school district's claim to check district's treasurer procured with district funds and used to pay personal debt).

b. *Remitter's name as a requirement for inquiry before disposition of proceeds.* Even if its name on the remitter line did not provide notice of its claim to the checks, Prestige argues, its name at least imposed on South Weymouth an obligation to inquire of Prestige as to the proper disposition of the funds. Here Prestige analogizes its position as a remitter to that of the drawer in other check fraud cases and premises its claim on the proposition that

> "[w]here a check is drawn to the order of a bank to which the drawer is not indebted, the bank is authorized to pay the proceeds only to persons specified by the drawer; it takes the risk in treating such a check as payable to bearer and is placed on inquiry as to the authority of the drawer's agent to receive payment."

*Govoni & Sons Constr. Co.* v. *Mechanics Bank*, 51 Mass. App. Ct. 35, 40 (2001), quoting from *Bank of S. Md.* v. *Robertson's Crab House*, 39 Md. App. 707, 715 (Ct. Spec. App. 1978).[12]

*Govoni* has been described by a leading commentator as "perhaps as exhaustive a statement of reasoning as seen in any such case where a check made payable to a bank is diverted to improper use by an unauthorized agent or employee of the drawer." 1 Bailey & Hagedorn, Brady on Bank Checks, *supra* at § 13.05, at 13-19 n.112). In that case, the Govoni companies employed an accountant whose responsibilities included payment of company taxes. The defendant was the companies' primary banking institution. From time to time, the accountant procured checks signed by company officers and, as pertinent here, made payable to the bank, ostensibly for tax payments. Instead, the accountant took the checks to the bank and deposited them in his own account. *Govoni*, 51 Mass. App. Ct. at 36-37.

---

[12]The Maryland court, in turn, quoted from 9 C.J.S. Banks & Banking § 340, at 683 (1938).

When the fraud was discovered, the companies sued the bank and largely prevailed in the trial court. This court modified the judgment in the companies' favor and affirmed. *Id.* at 51-52. Citing the principle quoted above, the court premised the bank's liability on a violation of G. L. c. 106, § 4-401(1), which provides that "a bank may charge against [a customer's] account any item which is otherwise properly payable from that account even though the charge creates an overdraft." The checks presented by the treasurer, the court held, "were not properly payable from the Govoni accounts absent inquiry by the bank into [the accountant's] authority to receive the proceeds." *Id.* at 41.

Although *Govoni* premised the inquiry rule on § 4-401(1) and the banking relationship between the Govoni companies and a bank that was both the payee and the drawee, other courts have fashioned a broader rule. In *Master Chem. Corp.* v. *Inkrott*, 55 Ohio St. 3d 23 (1990), for example, a majority of the Supreme Court of Ohio, after stating that § 4-103 of the Code referred to a collecting bank's obligation to exercise "ordinary care," stated the rule as follows:

> "In applying the common law, courts across the country have found uniformly that when a check is drawn to the order of a bank, the drawer has indicated his intention to place the funds in the bank's custody. . . . The bank is not entitled to treat the checks as bearer paper. . . . Once the payee bank accepts custody and control of the funds, it can justify dispensing the funds only in compliance with the instructions of the drawer. . . . If the payee bank assumes, without investigation, that the instructions of the presenter are those of the drawer, the payee bank does so at the risk of discovering that no such directions were given by the drawer. The payee bank becomes liable for the misdirected funds."

*Id.* at 25.[13] See *Sun 'n Sand, Inc.* v. *United Cal. Bank*, 21 Cal. 3d 671 (1978) (relying in part on warranties contained in §§ 3-417 and 4-207, none of which are alleged to have been

---

[13]The concurring opinion in *Master Chemical* rejected the majority's broad negligence approach and, like *Govoni*, premised the bank's liability solely on a violation of § 4-401(1). See *Master Chemical, supra* at 29-30 (Holmes, J., concurring). It is true that § 4-103 refers extensively to ordinary care and concludes with a statement regarding the measure of damages for "failure to

broken here); *Olean Area Camp Fire Council, Inc.* v. *Olean Dresser Clark Fed. Credit Union*, 142 Misc. 2d 1049, 1062 (N.Y. Sup. Ct. 1989). See also *Borrello* v. *Perera Co.*, 381 F. Supp. 1226 (S.D.N.Y. 1974); *Dalton & Marberry, P.C.* v. *Nationsbank, N.A.*, 982 S.W.2d 231 (Mo. 1998).

exercise ordinary care in handling an item." § 4-103(5). Nevertheless, as explicitly stated in comment 4 to § 4-103 of the Code, "[s]ection 4-202 states respects in which collecting banks must use ordinary care." Official Comment 4 to Uniform Commercial Code § 4-103, 2B U.L.A. 151 (Master ed. 2002) (prior art. 4). Section 4-202, in turn, contains no all-encompassing "ordinary care" requirement, and instead more narrowly provides that

"(1) A collecting bank must use ordinary care in

"(*a*) presenting an item or sending it for presentment; and

"(*b*) sending notice of dishonor or nonpayment or returning an item other than a documentary draft to the bank's transferor or directly to the depositary bank under subsection (2) of section 4-212 after learning that the item has not been paid or accepted, as the case may be; and

"(*c*) settling for an item when the bank receives final settlement; and

"(*d*) making or providing for any necessary protest; and

"(*e*) notifying its transferor of any loss or delay in transit within a reasonable time after discovery thereof."

G. L. c. 106, § 4-202. The 1998 U.C.C. eliminated § 4-202(1)(*d*), but is otherwise virtually identical. See G. L. c. 106, § 4-202(*a*) (1998). Against that backdrop, an integrated view of Article 4 leads to a conclusion that the common law does not roam freely over and through specific Code provisions but supplies a loss-allocation framework only when specific Code provisions do not. See, e.g., *McCarthy, Kenney & Reidy, P.C.* v. *First Natl. Bank of Boston*, 402 Mass. at 633-635; *City of Wellston* v. *Jackson*, 965 S.W.2d 867, 869, 870 (Mo. App. 1998). See generally G. L. c. 106, § 1-103 ("Unless displaced by the particular provisions of this chapter, the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions"); Hull, Common Law Negligence and Check Fraud Loss Allocation: Has Common Law Supplemented or Supplanted the U.C.C.?, 51 Ohio St. L.J. 605, 608, 611 (1990) ("In order to facilitate resolution of commercial disputes, the drafters sought to draft a set of rules that would eliminate the need to resort to general principles of law outside the U.C.C. in as many cases as possible. . . . [I]f check fraud cases could always be decided on common law negligence principles at the court's option rather than in accordance with statutory directive, the U.C.C. loss allocation system would cease to have meaning").

We need not determine here whether the Massachusetts inquiry rule described in *Govoni* applies only to drawee banks in situations covered by § 4-401(1) or applies more broadly any time a noncreditor bank is the payee of a check. Whatever the answer, it is of no help to Prestige, for every case on which Prestige relies discusses a bank's failure to consult the *drawer* of the check before following the presenter's instructions regarding disposition of the funds the check describes. See *Appley* v. *West*, 832 F.2d 1021 (7th Cir. 1987); *Federal Ins. Co.* v. *NCNB Natl. Bank of N.C.*, 958 F.2d 1544 (11th Cir. 1992); *Arvada Hardwood Floor Co.* v. *James*, 638 P.2d 828 (Colo. Ct. App. 1981); *New Jersey Steel Corp.* v. *Warburton*, 139 N.J. 536 (1995); *Fidelity & Cas. Co. of N.Y.* v. *Hellenic Bank Trust Co.*, 181 Misc. 40 (N.Y. 1943); *Ed Stinn Chevrolet, Inc.* v. *National City Bank*, 28 Ohio St. 3d 221 (1986); *Steele* v. *Victory Sav. Bank*, 295 S.C. 290 (Ct. App. 1988).[14]

In the present context, at least, the difference between the drawer and the remitter is fundamental, for, at bottom, a check is the drawer's order to pay money in a specified fashion from the drawer's account. See 1 Bailey & Hagedorn, Brady on Bank Checks § 1.09, at 1-13 (rev. ed. 2009). The drawer is a party to the instrument, has certain rights in the instrument, and knows how it intends the funds to flow. A remitter is in an entirely different position. As we noted earlier, the check is not drawn on the remitter's account; the remitter is not a party to the check, cannot enforce it, cannot order the drawee to dishonor it for reasons arising out of the underlying transaction, and is not in a position to direct disposition of the funds. See generally Maggs, Determining the Rights and Liabilities of the Remitter of a Negotiable Instrument: A Theory Applied to Some Unsettled Questions, 36 B.C. L. Rev. 619, 651-652 (1995).

The differences between the rights of the drawer and those of the remitter undoubtedly account for the result reached in two of only three decisions of which we are aware that applied the inquiry rule to cashier's or treasurer's checks. In those two, liability turned on failure to inquire of the drawer bank, not of the

---

[14]An additional case on which Prestige relies faulted the depository bank for failing to inquire of the presenter as to his authority to deposit the drawer's funds to his own account, thereby violating a duty the bank owed the drawer. *Federal Ins. Co.* v. *Groveland State Bank*, 37 N.Y.2d 252 (1975).

remitter. In the first of the two, *Kaiser-Georgetown Community Health Plan, Inc.* v. *Bankers Trust Co.*, 110 Misc. 2d 320 (N.Y. Sup. Ct. 1981), the remitter of a cashier's check claimed that the payee bank was liable for depositing the proceeds of the check in the personal account of a financial advisor without seeking instructions from itself or from the drawer bank. The court agreed that the payee bank had an obligation to seek instructions from the drawer bank but said nothing about seeking guidance from the remitter. In the second case, *City Natl. Bank* v. *Crocker Natl. Bank*, 197 Cal. Rptr. 721 (Ct. App. 1983),[15] someone misappropriated cashier's checks and diverted the proceeds to a use the issuing bank had not intended. The issuing bank, which was the drawer as well as the drawee, of the relevant checks brought suit against the payee bank for failing to inquire before disposing of the proceeds.

In the third case, *Allis Chalmers Leasing Servs. Corp.* v. *Byron Center State Bank*, 129 Mich. App. 602 (1983), the court, quoting, like other courts, see note 12, *supra*, from Corpus Juris Secundum, said that, "[w]here a check is drawn to the order of a bank to which the drawer is not indebted, the bank is authorized to pay the proceeds only to persons specified by the drawer," *id.* at 606, but then proceeded, without discussion or analysis, to apply the rule to a cashier's check the remitter had procured and delivered to a seller of motor vehicles for vehicles the seller never delivered. *Id.* at 605. The court did not specify how the remitter intended the seller to use the proceeds or how the seller had misdirected them and applied the rule even though the seller had used part of the proceeds to pay off a loan underlying a security interest the bank had in one of the vehicles. In reaching its result, the court relied on *Bank of S. Md.* v. *Robertson's Crab House*, 39 Md. App. 707 (Ct. Spec. App. 1978), and *Sun 'n Sand, Inc.* v. *United Calif. Bank*, 21 Cal. 3d 671 (1978), both of which involved corporate checks, not cashier's checks. *Allis Chalmers Leasing*, *supra* at 607-608. The court also relied on conversations between the remitter and bank officials about the motor vehicle purchase that occurred shortly before the seller presented the cashier's check to the bank and on a notation on the face of the check stating that it was in payment of an invoice for a lease

---

[15]The opinion was omitted from the official reporter after the matter was dismissed as moot pursuant to stipulation. 150 Cal. App. 3d at 304.

covering the specified vehicles, though the opinion described neither the invoice nor the lease. *Id.* at 609.

The fundamental differences between the drawer and the re-mitter lead us to reject the analogy between the two that Prestige would have us draw, and that the court in *Allis Chalmers Leas-ing* may have drawn, although ambiguities in the opinion leave us in some doubt on that score. Here, SSB, not Prestige, was the drawer of the relevant checks, and SSB makes no claims against South Weymouth. Moreover, nothing in the record sug-gests that if South Weymouth had inquired of SSB before dispos-ing of the checks in the fashion Malick directed, SSB would have given instructions different from Malick's. See *Steele* v. *Victory Sav. Bank*, 295 S.C. at 295, discussing *Kaiser-Georgetown Community Health Plan, Inc.* v. *Bankers Trust Co.*, *supra.*

Under all of these circumstances, we think that *Cassello* v. *Allegiant Bank*, 288 F.3d 339, 342 (8th Cir. 2002), a Federal case applying Missouri law, supplies a rule of decision that recognizes a remitter's limited rights and that is consistent with the interpretation we have heretofore given applicable Code pro-visions. In *Cassello*, the court stated as follows:

> "Royal[, the payee bank,] points out that while the plaintiffs were drawers of some of the checks in issue, they were re-mitters of the others (the cashier's checks). The UCC de-fines a remitter as 'a person who purchases an instrument from its issuer if the instrument is payable to an identified person other than the purchaser' [citing § 3-103(*a*)(11) of the 1990 Code revisions]. Royal argues that as remitters the plaintiffs . . . have no claim against the depositary bank for breach of warranty. We agree. Missouri courts have held that a remitter may assert a contract claim against the selling bank when the [cashier's] check is paid to an improper party. . . . But a remitter lacks a cause of action under the UCC against the depositary bank, unless, of course, the depositary bank was also the issuing bank. The proper party to sue the depositary bank under the UCC is the drawee.
>
> ". . .
>
> "The remitter should instead bring his or her action, if any, against the bank that sold the remitter the cashier's check."

*Cassello,* 288 F.3d at 342. Under that rule, South Weymouth incurs no liability for failing to inquire of Prestige before applying the funds in the manner Malick directed.

ii. *Fiduciary relationship and suspicious behavior.* Finally, Prestige argues that South Weymouth was on notice of Prestige's claims because South Weymouth had knowledge of Malick's fiduciary relationship to Prestige and of his generally suspicious behavior. Here, the Code's provisions as to "notice" and "knowledge" are relevant. The Code provides that a "purchaser"[16] of an instrument "has notice of a claim against the instrument when he has knowledge that a fiduciary has negotiated the instrument in payment of or as security for his own debt or in any transaction for his own benefit or otherwise in breach of duty." G. L. c. 106, § 3-304(2). Under the Code, "knowledge" is a far more restrictive concept than "notice," for the Code provides that a person "has 'knowledge' of a fact when he has actual knowledge of it." G. L. c. 106, § 1-201(25).

South Weymouth's affidavit states that it had no knowledge of a fiduciary relationship between Prestige and Malick. At most, the record suggests that, as of November 1, 1990, after the last treasurer's check had been negotiated, a South Weymouth security officer knew that Malick worked for Prestige.[17] There is no suggestion that the security officer or any other employee of South Weymouth knew the capacity in which Malick was employed. As thus constituted, the record is not sufficient to raise a genuine

---

[16] A "purchaser" is "a person . . . who takes by purchase." G. L. c. 106, § 1-201(33). In turn, "purchase" means "taking by sale, discount, negotiation, mortgage, pledge, lien, issue or re-issue, gift or any other voluntary transaction creating an interest in property." G. L. c. 106, § 1-201(32). In sum, for purposes of the Code, "purchasers" are those who acquire an instrument in many different ways, and there can be no doubt that South Weymouth was a "purchaser" of the checks at issue here.

[17] In that regard, however, the record also shows the following. On November 1, 1990, Malick attempted to deposit to his own account a Prestige check drawn on SSB to Malick's order. After determining from SSB that there were insufficient funds to pay the check, a South Weymouth official spoke to Helmut Schmidt, the president of Prestige, on the telephone and inquired about the check. Schmidt said that he knew nothing about it. Later, however, Schmidt called back and put Malick on the line, whereupon Malick said that there would be funds sufficient to cover the check later in the day and that South Weymouth should proceed to process the check. Later in the day, Malick came to the bank, picked up the check, and cancelled the deposit.

issue of material fact as to South Weymouth's knowledge of a fiduciary relationship between Prestige and Malick.

As for suspicious activities, it is true that the volume of Malick's banking activity attracted the attention of South Weymouth officials as early as June of 1990, though the truly suspicious activities reflected in the record occurred after Malick negotiated the last of the SSB checks. In any event, general suspicions about an individual's conduct do not provide, without more, notice of a claim or defense to a particular instrument. See generally *In re Williams Bros. Asphalt Paving Co.*, 59 B.R. 71, 76-77 (W.D. Mich. 1986); *Wohlrabe v. Pownell*, 307 N.W.2d 478, 485 (Minn. 1981); *Johnstown Mfg., Inc. v. Haynes*, 53 Ohio App. 3d 42, 44-45 (1988). See also *Universal C.I.T. Credit Corp. v. Ingel*, 347 Mass. 119, 125 (1964) ("The trial judge correctly excluded the evidence offered by the defendants [makers of the note] to show that the [payee and the plaintiff, its assignee,] had worked together on various aspects of the financing and that the plaintiff was aware of complaints against [the payee] by previous customers. . . . [T]here was nothing in this evidence by which the plaintiff had 'reason to know' of any fraud. The letter . . . from the plaintiff to the defendant . . . was also properly excluded; it is immaterial that the plaintiff may have found out about [the payee's] alleged fraudulent representations after the note had been purchased").[18]

*Conclusion.* In sum, we are of the opinion that summary judgment was properly entered in favor of South Weymouth. South Weymouth was a holder of the SSB treasurer's checks for value. On this record, the fact that Prestige's name appeared on the remitter line did not place South Weymouth on notice that Prestige had a claim or defense to the instruments. South Weymouth had no obligation to inquire of Prestige before using the check proceeds to pay debts it was owed by Malick or crediting those proceeds to Malick's accounts. Malick engaged in a sophisticated fraud with substantially adverse consequences to Prestige, but on this record South Weymouth is not required to restore the money Malick stole.

*Judgment affirmed.*

---

[18]See also *First Independence Capital Corp. v. Merrill Lynch Bus. Financial Servs. Inc.*, 181 Fed. Appx. 524, 529-530 (6th Cir. 2006) (unpublished).